E. GRADY JOLLY, Circuit Judge:
Erony Pratt, the mother of the deceased, filed this 42 U.S.C. § 1983 lawsuit alleging that officers of the Harris County Sheriffs Department (“HCSD”), in Harris County, Texas, caused her son’s death by using excessive force in restraining him during his arrest. Furthermore, she asserted, under Monell v. New York City Dept. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that Harris County was also liable for his death. The district court granted qualified immunity to HCSD officers in their individual capacity and denied Pratt’s claims under Monell. Pratt appealed. Finding no error, we AFFIRM.
I.
A.
In reviewing an appeal from summary judgment, we “view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.” See Deville v. Marcantel, 567 F.3d 156, 163-64 (5th Cir.2009). The majority of the facts in this opinion, therefore, are adopted from the appellant’s briefing before this Court.
*178 Wayne Pratt (“Pratt”) was involved in a minor traffic accident. In response to a disturbance call, HCSD Deputy Vincent Lopez, upon arrival at the scene, observed a vehicle with front-end damage resting in a ditch and Pratt “running in circles ... imitating a boxer.”[1] HCSD Deputies Brian Goldstein and Michael Medina arrived shortly. All three officers attempted to interact with Pratt. Pratt did not respond, but began to walk away. All three officers requested that he stop walking away. Pratt still did not respond, and remained in an uncooperative state.
After several warnings, Pratt began approaching Lopez and came within 5-7 feet of Lopez. Lopez then unholstered his ta-ser and commanded Pratt to stop. At this point, Goldstein and Medina unholstered their tasers as well and Pratt began to run away. Lopez deployed his taser, but was ineffective in stopping Pratt.[2] Lopez cycled his taser two more times in the next forty seconds, which also failed to stop Pratt. Around this time, deputies Tommy Wilks, Tarzis Lobos, Francisco Salazar, B.J. Auzene, R. DeAlejandro, and R.M. Goerlitz arrived at the scene.
Because Lopez’s efforts to subdue Pratt were ineffective, Medina deployed his ta-ser. Pratt fell to the ground. Goldstein attempted to handcuff Pratt but, because of Pratt’s continued resistance, he was able to secure only one of Pratt’s arms in a handcuff. Medina cycled his taser two more times in the next thirty seconds. Pratt continued to struggle. When Lobos began aiding Goldstein in handcuffing Pratt, however, he stopped resisting and said “okay, okay, I’ll quit.... I’ll stop fighting.” Goldstein then secured both of Pratt’s arms in handcuffs. Pratt was patted down for weapons. None were found.
After Pratt was in handcuffs, Salazar aided Goldstein in lifting Pratt and walking him toward the patrol car. After a few steps, however, Pratt again began to resist and broke free from Goldstein’s grip. Salazar returned Pratt to the ground. While on the ground, Pratt began kicking at Goldstein and Salazar. Pratt kicked Gold-stein in the groin twice during the exchange. Witnessing this exchange, Wilks retrieved a hobble restraint (i.e., handcuffs that attach to an arrestee’s ankles) from his patrol car.
As Pratt continued to struggle, Salazar, Lobos, and Medina attempted to aid Gold-stein in controlling him. During this struggle Medina tasered Pratt once again, this time in “drive stun mode” (in which the taser leads make direct contact with the arrestee’s body), and Goldstein was able to gain control of Pratt’s legs. Gold-stein then rolled Pratt onto his stomach, crossed Pratt’s legs, and bent them towards his buttocks. Salazar also placed his knee on Pratt’s back in order to maintain compliance. When Wilks returned with the hobble restraint, Goldstein aided him in attaching it to Pratt’s legs. Pratt ceased resisting and said “Ok I quit. I’m done.” Goldstein and Salazar also ceased *179 physically restraining him. At this point, Pratt’s handcuffs were connected to the hobble restraint behind his back. Pratt was “hog-tied”.
Shortly, EMS arrived at the scene.[3] EMS paramedics requested that the hobble restraint and handcuffs be removed so CPR could be administered. Pratt did not have a pulse and had ceased breathing. Upon treatment, Pratt regained a pulse, but did not resume independent breathing until after arriving at the hospital. Pratt died the following morning.
Following his death Dr. Darshan Phan-tak conducted Pratt’s autopsy and concluded that “[t]he cause and manner of the death ... [wa]s best classified as ‘UNDETERMINED’ ”. Dr. Phantak based this conclusion on the fact that he could not “definitively separate! ]” the effect of Pratt’s ingestion of cocaine and ethanol, from the other possible contributing factors — which, at least, included Pratt’s car accident, various altercations, tasing, and hog-tying — that culminated in his asphyxiation.
Dr. Lee Ann Grossberg, Pratt’s expert witness, also submitted an affidavit to the district court, which differed from the findings of Dr. Phantak. Specifically, rather than leaving the cause of death undetermined, Dr. Grossberg described the cause of death as “multi-factorial” and “list[ed] the factors that contributed to the death.” In Dr. Grossberg’s opinion, “the cause of death ... [wa]s due to the combined effects of prone restraint and cocaine and ethanol toxicity” and “[c]ontributing factors also include[d] TASER use, dilated/hypertrophic cardiomyopathy, obesity and chronic drug use.” Dr. Grossberg further concluded that Pratt’s death was “complex and multi-factorial” and that “no single factor is 100% responsible”; rather, it was “the combination of events and factors in a susceptible individual that eause[d] the ‘perfect storm’ ... [that] resulted] in the death.”
At the time of Pratt’s arrest, the HCSD had a policy that prohibited officers from using hog-tie restraints, prompting the HCSD to conduct an “In Custody Death Review” of Pratt’s death. The results were presented to a grand jury, and Gold-stein, Medina, and Lopez were no-billed by the grand jury. A second internal investigation was conducted, reviewing specifically the use of the “hog-tying” restraint by Goldstein and Wilks. The Administrative Disciplinary committee found Goldstein and Wilks’s alleged misconduct “not sustained.”
B.
As earlier indicated, Erony Pratt, individually and as representative of Pratt’s estate, brought this § 1983 cause of action alleging various violations of Pratt’s Fourth Amendment rights against individual .officers and Harris County. The HCSD officers moved for summary judgment, asserting defenses of qualified immunity. Harris County also moved for summary judgment contending that Pratt failed to sufficiently plead Monell liability as a matter of law. On summary judgment, the district court granted qualified *180 immunity to the HCSD officers, denied Pratt’s Monell claims against Harris County, and dismissed the complaint. Pratt v. Harris Cnty., Tex., No. H-12-1770, 2015 WL 224945 (S.D.Tex. Jan. 15, 2015).
On appeal, Pratt challenges the district court’s grant of qualified immunity, contending unconstitutional conduct by HCSD officers as follows: 1) Deputies Lopez and Medina’s excessive use of force by tasing Pratt; 2) Deputies Wilks, Goldstein, and Salazar’s excessive use of force by hogtying Pratt; 3) Deputies Auzene, DeAle-jandro, Goerlitz, and Lobos’s failure to assist Pratt during either allegedly excessive use of force; and 4) Sergeants M. Coker and E.M. Jones, and Sheriff Adrian Garcia’s failure to train and/or supervise the nine deputies present at the scene of Pratt’s arrest. Furthermore, Pratt maintains that Harris County is liable under Monell for: 1) tasing and hog-tying customs that fairly represented municipal policy; 2) failure to train and/or supervise; and 3) ratification of the unconstitutional conduct of the HCSD officers.
II.
We review the district court’s grant of summary judgment de novo, also applying the same standards as the district court. See Newman v. Guedry, 703 F.3d 757, 761 (5th Cir.2012). Summary judgment is only appropriate if “there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). “On a motion for summary judgment, [we] must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.” Deville v. Marcantel, 567 F.3d 156, 163-64 (5th Cir.2009).
To establish a claim under § 1983, “a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.” Whitley v. Hanna, 726 F.3d 631, 638 (5th Cir.2013), cert. denied, — U.S.-, 134 S.Ct. 1935, 188 L.Ed.2d 960 (2014). Additionally, “[c]laims under § 1983 may be brought against persons in their individual or official capacity, or against a governmental entity.” Goodman v. Harris Cnty., 571 F.3d 388, 395 (5th Cir.2009).
A municipality and/or its policymakers may be held liable under § 1983 “when execution of a government’s policy or custom ... by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury....” Monell, 436 U.S. at 694, 98 S.Ct. 2018; see also Peterson v. City of Fort Worth, 588 F.3d 838, 847 (5th Cir.2009) (requiring plaintiffs asserting Monell-liabHity claims to show “(1) an official policy (2) promulgated by the municipal policymaker (3) [that was also] the moving force behind the violation of a constitutional right”).
III.
We will first address the § 1983 claims against various HCSD officers. Because the officers were sued in their individual capacity, they asserted qualified immunity defenses. See Goodman, 571 F.3d at 395; see also Pratt, 2015 WL 224945 at *8. “The doctrine of qualified immunity shields officials from civil liability so long as their conduct ‘does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” Mullenix v. Luna, — U.S.-, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 *181 L.Ed.2d 565 (2009)). “Put simply, qualified immunity protects ‘all but the plainly incompetent or those who knowingly violate the law.’ ” Id. (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). We must also assess the reasonableness of each defendant’s actions separately, even if those defendants acted in unison. See Meadours v. Ermel, 483 F.3d 417, 422 (5th Cir.2007).
When evaluating a qualified immunity defense, we conduct a “well-known” two-prong inquiry. Bazan ex rel. Bazan v. Hidalgo Cty., 246 F.3d 481, 490 (5th Cir.2001). “In order to overcome a qualified immunity defense, a plaintiff must allege a violation of a constitutional right, and then must show that ‘the right was clearly established ... in light of the specific context of the case.’ ” Thompson v. Mercer, 762 F.3d 433, 437 (5th Cir.2014) (emphasis added) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Furthermore, we “may address these two elements in either order, and need not proceed to the second where the first is resolved in the negative.” Id. (citations omitted).
We first turn to whether Pratt has shown the violation of a constitutional right.
A.
Pratt 'argues that HCSD officers violated her son’s Fourth Amendment rights of reasonable search and seizure by using excessive force in his arrest. Furthermore, Pratt contends that the HCSD officers’ conduct was unconstitutionally excessive, i.e., unreasonable, in two ways: by tasering her son unnecessarily and by hogtying him.
“When a plaintiff alleges excessive force during an investigation or arrest, the ... right at issue is the Fourth Amendment right against unreasonable seizures.” Tolan v. Cotton, — U.S. -, 134 S.Ct. 1861, 1865-66, 188 L.Ed.2d 895 (2014) (citing Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Furthermore, determining, “whether this right was violated requires a balancing of ‘the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.’ ” Id. (emphasis added) (quoting Tennessee v. Garner, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).
When a plaintiff alleges a violation of his Fourth Amendment rights due to excessive force, we are presented with a legal question concerning the reasonableness of the officer’s conduct, which is embodied in the claim itself. Specifically, to establish a claim of excessive force under the Fourth Amendment, Pratt “must demonstrate: ‘(1) [an] injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.’” Deville, 567 F.3d at 167 (emphasis added) (quoting Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir.2005)). “Excessive force claims are necessarily fact-intensive.” Id. Therefore, “whether the force used is ‘excessive’ or ‘unreasonable’ depends on ‘the facts and circumstances of each particular case’ ”, and we must “consider ... ‘the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.’ ” Id. (citing Graham, 490 U.S. at 396, 109.S.Ct. 1865).
1.
First, Pratt contends that Deputies Lopez and Medina violated her son’s *182 Fourth Amendment rights by using excessive use in tasing him unnecessarily. Pratt, however, has not demonstrated by facts, or alleged facts subject to dispute, that the officers used unnecessary or unreasonable force under the circumstances.
Construing the facts in the light most favorable to him, Pratt ignored multiple requests and warnings from both Lopez and Medina. Indeed, Pratt aggressively evaded Lopez and Medina’s attempts to apprehend him. Only after he continuously failed to comply, did either deputy deploy tasers; Medina used his taser only after Lopez’s efforts to subdue Pratt were ineffective. The evidence showed that Medina cycled his taser only when Pratt continued to resist handcuffing. Once Pratt complied, and Goldstein was able to handcuff him, Medina stopped using his taser. But, when Pratt kicked an officer after being taken to the ground, Medina used his taser again; and, once again, officers were able to control him. It is also important that neither officer used their taser as the first method to gain Pratt’s compliance. The record shows that both officers responded “with ‘measured and ascending’ actions that corresponded to [Pratt’s] escalating verbal and physical resistance.” See Poole v. City of Shreveport, 691 F.3d 624, 629 (5th Cir.2012) (citations omitted).
In sum, Pratt has not shown that Lopez and Medina’s use of tasers was “clearly excessive” or “unreasonable.” Accordingly, we hold that the district court did not err in granting both Lopez and Medina qualified immunity in this respect.
2.
Next, Pratt contends that Deputies Wilks, Goldstein, and Salazar violated her son’s Fourth Amendment rights by using excessive force in hog-tying him. Although hog-tying is a controversial restraint, we have never held that an officer’s use of a hog-tie restraint is, per se, an unconstitutional use of excessive force. We have, however, previously addressed the excessiveness and reasonableness of the restraint.
In Gutierrez v. City of San Antonio, 139 F.3d 441 (5th Cir.1998), Gutierrez resisted arrest, was violent towards officers, and was hog-tied (by having his “legs [drawn] backward at a 90-degree angle in an ‘L’ shape” and connected, behind his back, to his hands). Id. at 443. Gutierrez, still resisting, was then placed face down in the back of a patrol car and driven to a hospital for the treatment of injuries sustained during his arrest. Id. Upon arrival at the hospital, Gutierrez had stopped breathing. Id. Shortly thereafter, he was pronounced dead. Id. Against this background we said that “hog-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances — i.e., when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position.” Id. at 451. In the context of that case, we found a triable issue in using a hog-tie restraint. Significant to that finding, however, was that Gutierrez had told the arresting officers he was on drugs. Id. at 448-49 (“Gutierrez told [Officer] Walters that he had used bad cocaine.... Viewing these disputed facts in the light most favorable to Gutierrez, the summary judgment record shows that the officers knew that Gutierrez was under the influence of drugs.... ”). The Gutierrez court took particular care to add: “In conclusion, our holding today is very limited.” See id. at 451.
Over ten years later, this Court again addressed the constitutionality of hog-tie restraints. In Hill v. Carroll Cnty., Miss., 587 F.3d 230 (5th Cir.2009), we held that an officer’s use of a “four-point re *183 straint” — the more formal term for “hogtying” — was not a “per se unconstitutionally excessive use of force.” Hill, 587 F.3d at 235 (“Gutierrez does not hold four-point restraint a per se unconstitutionally excessive use of force.... ”). Like Gutierrez, Loggins resisted arrest, was violent towards officers, and was hog-tied. Id. at 232-33. Also, like Gutierrez, Loggins was placed face down in the back of a patrol car while hog-tied and transported for approximately 30 minutes to the nearest hospital. Id. at 233. Like Gutierrez, Loggins ceased breathing, and was pronounced dead upon arrival at the hospital. Id. Unlike Gutierrez, however, Loggins was not under the influence of drugs or alcohol during her arrest. Id. Furthermore, at trial, Loggins’s medical expert testified specifically that she “died from positional asphyxia (suffocation)”. Id.
On appeal, however, we determined that “[t]he exact cause of Loggins’s death [wa]s unclear” because although her “body temperature at the time of death was recorded at 107.5°F, an elevation consistent with the official autopsy diagnosis of fatal hyperthermia[,] Loggins was also obese and hypertensive”. Id. Furthermore, we said that “[w]hile characterizing [hog-tie] restraints as dangerous when applied to a morbidly obese woman ... [Loggins’s expert’s] testimony fail[ed] to raise a material fact issue that the use of four-point restraints was objectively unreasonable.” Id. at 236. Accordingly, we held that “deputies cannot be held responsible for the unexpected, albeit tragic result, of their use of necessary force”, because “[j]udged from the perspective of an officer at the scene of Loggins’s arrest and transportation, as Graham ... requires, the deputies had no objective basis not to use four-point restraints.” Id. at 237. Consequently, there was no “material fact issue” whether “the deputies’ use of four-point restraints was unnecessary, excessively disproportionate to the resistance they faced, or objectively unreasonable in terms of its peril to [the arrestee]”. Id.
Since Hill, this Court has spoken only once, in Khan v. Normand, 683 F.3d 192 (5th Cir.2012), on the constitutionality of hog-tying. In Khan we held that an officer’s decision to hog-tie a drug-affected arrestee did not violate a clearly established constitutional right because the restraint was used only briefly and the arresting officers did not know that the arrestee was under the influence of drugs.[4] See id. at 195-96.
On appeal, Pratt argues that it is significant that the HCSD had a policy prohibiting the hog-tying of arrestees. Pratt also points out that Officer Wilks, the primary facilitator of Pratt’s hog-tying, acknowledged his belief that hog-tying was unconstitutional.[5] Pratt further contends that her son had stopped resisting, at least temporarily, at the time he was hog-tied, but acknowledges that he had to be subdued earlier after “giving up”.[6] But, the *184 constitutionality of an officer’s actions, is neither guided nor governed by an officer’s subjective beliefs about the constitutionality of his actions or by his adherence to the policies of the department under which he operates. See, e.g., Hernandez v. Estelle, 788 F.2d 1154, 1158 (5th Cir.1986) (“The claim is that the mere failure ... to follow their [departmental] regulations was a constitutional violation. There is no such controlling constitutional principle.”). Instead, we must examine whether the HCSD officers’ conduct was excessive or unreasonable under the “circumstances of [this] particular case.” Deville, 567 F.3d at 167. Considering the record evidence, neither the circumstances surrounding the arrest nor our precedent support that the decision to hog-tie Pratt was an excessive or unreasonable one.
First, as earlier observed, we have never held that hog-tying is a per se unconstitutional technique of controlling a resisting arrestee. Thus, an assertion of hog-tying alone does not constitute a claim of excessive force. Instead, Pratt “must demonstrate: ‘(1) [an] injury, (2) which resulted directly and only from a use of force that was dearly excessive, and (3) the excessiveness of which was clearly unreasonable.’ ” Id. (emphasis added).
Turning to the excessiveness and unreasonableness of Deputies Wilks, Goldstein, and Salazar’s conduct, the record evidence shows that Pratt ignored multiple requests and warnings from all three officers; and, he aggressively evaded their attempts to apprehend him, even after promising compliance. Construing the facts in the light most favorable to him, it is clear from the record that Pratt did not follow through on his offers to comply with the officers’ requests. Instead, Pratt renewed resistance, broke free from the officers’ grips, and kicked at officers attempting to restrain him (eventually kicking one officer in the groin twice). Furthermore, unlike the arrestee in Gutierrez, the officers who hog-tied Pratt were unaware of his use of drugs or alcohol when they hog-tied him, and Pratt does not contend that her son volunteered such information. Additionally, unlike the arrestees in Gutierrez and Hill, neither party contests that Pratt was only restrained for a very brief period. Thus, in the factual context of this case, the use of the hog-tie restraint was not unconstitutionally excessive, or unreasonable.
To conclude, in the light of Pratt’s “on again, off again” commitment to cease resisting, his recurring violence, and the-threat he posed while unrestrained, it was not, under the totality of the circumstances, “clearly excessive” or “unreasonable” for HCSD officers to restrain him as they did. For these reasons, we hold that the district court did not err in granting Wilks, Goldstein, or Salazar qualified immunity.
IV.
In sum, the record evidence, read in the light most favorable to Pratt, does not *185 show that his Fourth Amendment rights were violated.[7] The district court’s judgment is, in all respects
AFFIRMED.

. Officer Lopez also testified that Pratt "appeared to be intoxicated, and his behavior was erratic." There is no evidence in the record, however, that Officer Lopez relayed this information to any other officer upon their arrival at the scene.

. The HCSD’s tasers typically discharge two probes. If both probes attach to an arrestee's skin, then the arrestee’s body completes the path between the two probes. A predetermined voltage is then applied by the taser and an electrical current flows through the arres-tee’s body. Feeling the effects of the electrical current flowing through his body, the ar-restee is typically incapacitated. If, however, only one probe connects to the arrestee upon deployment, and the other probe, for instance, falls to the ground, then the circuit is not complete, and almost no current flows through the arrestee’s body.

. The exact duration of Pratt’s restraint has not been alleged by either party. The taser log indicates that Pratt’s last tasing (which took place immediately before he was hogtied) occurred at 20:27:18. The paramedics began treating Pratt at approximately "20:27.” Although these timelines seem inconsistent, it is important that the timeline established by the taser log was automated, while the timeline established by Paramedic William Slagle's testimony was entered manually sometime after the incident, and “[s]ome of the [times entered] [we]re rough guesstimates ... about when each event took place.” Nevertheless, it appears that Pratt was restrained for a very brief period.

.Specifically, in Khan we held that "Khan’s treatment did not violate a clearly established right” because "[ujnlike in Hill, Khan was not left face down in the four-point restraint for an extended period of time.” Khan v. Normand, 683 F.3d 192, 195 (5th Cir.2012). Moreover, in Khan we also held that "the brevity of Khan’s restraint and the constant supervision similarly distinguished] [Khan] from Gutierrez and, “Gutierrez [also] dealt with officers who knew the decedent had — as he told the officers — ‘shot some bad coke.’ ... [whereas] [t]he record contained] no similar knowledge by the officers in the field.” Id. at 195-96.

. Wilks Dep. 48:25-49:1-2 (“Q: [Y]ou were aware that [hog-tying Pratt] would not be constitutional. Correct? A: Yes.”)

. See Goldstein Dep. 119:17-21, Jan. 13, 2014 (“When I put the hobble on, he said, okay, I *184 quit. I’m done. Sorry. Whatever. He stopped resisting. He had no resistance whatsoever. So I believe Deputy Salazar had the long end of the hobble. And I just got up.”); Wilks Dep. 46:1-11 ("Q: After you hobbled him ... was he still kicking? A: No. Q: Was he still swinging his legs? A: No. Q: Swinging his arms? A: No, ma’am.”); Salazar Incident Rep., May 12, 2010 ("During this time, as Deputy Goldstein and I were attempting to hold the suspect down, Deputy M. Medina ... dry stunned the suspect, the suspect then became compliant.”); see also Lo-bos Aff., at 2 ("Deputy M. Medina moved in and deployed a drive stun to Mr. Pratt’s back ... in an attempt to gain control and compliance. This was effective because Deputy Goldstein was able to take control of Mr. Pratt’s legs as he had now stopped resisting.”).

. The remainder of Pratt's claims — that other deputies failed to intervene on his behalf, that supervisory officers (in their individual capacity) failed to sufficiently train the deputies who participated in Pratt’s arrest, and that the County violated his rights by not preventing the tasering and hog-tying practices — are premised on a violation of his constitutional rights. Because, as discussed above, Pratt cannot show such a violation, we need not address these claims.