# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 19-60350

United States Court of Appeals
Fifth Circuit

**FILED**
April 24, 2020

Lyle W. Cayce
Clerk

KELLI DENISE GOODE, Individually,

　　　　Plaintiff - Appellee

v.

TODD BAGGETT, Individually; JEREMY BOND, Individually; TYLER
PRICE, Individually; JOEL RICH, Individually; JASON SCALLORN,
Individually,

　　　　Defendants - Appellants

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:17-CV-60

Before CLEMENT, HIGGINSON, and ENGELHARDT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:*

　　　Troy Goode died in police custody after being "hog-tied" for ninety
minutes. His wife, Kelli Goode, sued the police officers and others involved in
Troy's death. As relevant here, she claimed that the officers used excessive
force in hog-tying Troy. The officers invoked qualified immunity and moved for
summary judgment, which the district court denied. This appeal followed.

---

　　　* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

No. 19-60350

Because the officers would not be entitled to qualified immunity under Kelli's version of the facts, we affirm the district court's denial of summary judgment.

I.

On July 18, 2015, Troy and Kelli Goode travelled to Southaven, Mississippi, to attend a Widespread Panic concert.[1] When they arrived, Troy ingested the hallucinogenic drug lysergic acid diethylamide ("LSD"). He then became overwhelmed with anxiety. Just before the show started, the couple decided to leave. Troy began to feel claustrophobic on the way home, so he got out of the car and walked to a grassy area between the road and a shopping center. Troy was pacing around there and yelling, "I don't know what to do."

Before long, City of Southaven police officers were headed to Troy in response to a call about a "disturbance." The dispatcher told them that Troy was acting erratically and likely on drugs. Todd Baggett arrived first. Kelli told Baggett that Troy took LSD and was having a panic attack. Troy walked up while Baggett and Kelli were talking, and Baggett asked him if he was okay. Troy said no and walked away, mumbling incoherently. Jason Scallorn arrived minutes later with his canine partner, Wessel, in the back seat of his car. When Scallorn arrived, Troy was "running around in circles" like "a little puppy."

When Troy saw Scallorn, he put his hands up and said, "I'll go." Scallorn told Troy to get down, and he said, "okay." But Troy then opened the back door of Scallorn's car, inadvertently releasing Wessel, and Scallorn ordered the dog to attack. Once Wessel released him, Troy got to his feet and backed away with his hands up. Scallorn then fired his taser at Troy, and Troy fell to the ground.

---

[1] Because of the constraints of interlocutory review, we take these facts from the district court's opinion and the summary-judgment record and view them in the light most favorable to Kelli. *See Flores v. City of Palacios*, 381 F.3d 391, 394–95 (5th Cir. 2004).

No. 19-60350

By this time, three more officers had arrived: Joel Rich, Jeremy Bond, and Tyler Price. Baggett, Rich, Bond, and Price pinned Troy down, handcuffed him, and called for an ambulance. Although the officers claim that Troy fought to break free, Kelli says Troy was immediately subdued with "multiple officers on top of him with their knees in his back." After Troy was handcuffed, Baggett bent Troy's legs behind his back, and Bond asked for leg shackles. Scallorn returned with his personal set of leg shackles: two metal cuffs connected by a fifteen-inch chain.[2]

While the others held Troy down, Bond attached one end of the shackles to one of Troy's legs. He then looped the chain through Troy's handcuffs and attached the other end to Troy's other leg. As a result, Troy's ankles were bound to his wrists, behind his back, with less than a foot of separation. This restraint method is known as "hog-tying."[3] Troy was hog-tied around 7:54 p.m.

After the officers hog-tied Troy, Baggett found an inhaler in Troy's pocket, and Kelli told him that Troy suffered from asthma. When the ambulance arrived, officers picked Troy up by the shackles "like a bale of hay" and put him face down on a gurney. Troy was then strapped tightly to the gurney and loaded into the ambulance. A witness said Troy appeared to be in distress and "struggling to breathe."

The ambulance left for the hospital at 8:15 p.m. Baggett and Rich rode in the back of the ambulance with a paramedic. Scallorn and Bond followed in their cars. When they arrived at the hospital, Baggett and Rich went with Troy

---

[2] The City of Southaven doesn't issue leg shackles or train officers in their use; Scallorn bought these himself.

[3] The parties quibble over whether this type of restraint should be called a "hog-tie" or a "four-point restraint." But there is no dispute about how Troy was restrained, so the term used to describe it is irrelevant. We use the term "hog-tie," which is consistent with our precedent and the terminology used in other circuits. *See, e.g., Pratt v. Harris County*, 822 F.3d 174, 179 (5th Cir. 2016); *Cruz v. City of Laramie*, 239 F.3d 1183, 1188 (10th Cir. 2001).

3

to a room for triage. Scallorn briefly joined them there before returning to the police station. Bond then drove Rich back to the scene to get Baggett's car, while Baggett stayed with Troy. During this time, Troy remained hog-tied face down on the gurney. When triage was complete, Baggett followed Troy to another room for treatment. At this point, Troy's face was bright red and swollen, his eyes were bulging, and he was moaning loudly. A witness said Troy appeared to have difficulty breathing, and she heard him say "breathe."

In the treatment room, Troy was moved from the gurney to a bed, but he remained hog-tied. According to the doctor and nurses who examined him, it was the officers' decision to keep Troy hog-tied. Troy's heart rate was rapid, so the doctor ordered a nurse to administer sedatives. The nurse gave Troy the sedatives and then left the room, leaving Baggett alone with Troy.

About fourteen minutes later, Baggett noticed that Troy was silent and motionless. He got closer and saw that Troy's face was purple, so he called for a nurse. The nurse initiated a "code blue" because Troy wasn't breathing, and a medical team arrived moments later. Baggett then removed Troy's restraints and left the room. After unsuccessful efforts to resuscitate him, Troy was declared dead at 9:44 p.m. A doctor who performed an autopsy on Troy testified that the cause of Troy's death was cardiorespiratory failure brought about by the hog-tie restraint.

On behalf of Troy's estate, Kelli sued the officers and others involved in Troy's death for violations of Troy's rights under the Fourth, Fifth, and Fourteenth Amendments and state law. In particular, she claims that Baggett, Scallorn, Rich, Bond, and Price (collectively, "Officers") used excessive force by hog-tying Troy and keeping him face down for ninety minutes despite knowing that he was on drugs and delirious. The Officers moved for summary judgment on the basis of qualified immunity. The district court first determined that *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998), was "adequate

No. 19-60350

authority at a sufficiently high level of specificity" to put the Officers on notice that hog-tying would violate clearly established law in some situations. The court then identified many factual disputes that prevented it from determining whether the Officers' use of hog-tying was unlawful. As a result, the court denied the Officers' motion as to that claim.[4] The Officers then filed this interlocutory appeal.

II.

We first address our jurisdiction. Ordinarily, a denial of summary judgment isn't a final, appealable decision. *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014). An order denying qualified immunity, though, is capable of immediate review. *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc). But our jurisdiction is "significantly limited." *Id.* We may review the district court's order only "to the extent that [it] turns on an issue of law." *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

When a district court denies qualified immunity at the summary-judgment stage, it makes two determinations. *Id.* First, it determines that "a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law." *Id.* Second, it determines that a genuine dispute of fact exists about whether the defendant "did, in fact, engage in such conduct." *Id.* In an interlocutory appeal, we can't second-guess the district court's assessment of the evidence—that is, whether the record could support a finding that certain conduct occurred. *Id.* at 347. We can consider only whether that conduct "would be objectively unreasonable in light of clearly established law." *Id.* (citing *Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996)).

---

[4] The district court did, however, grant summary judgment to the Officers on several other claims, including an excessive-force claim based on the Officers' use of the canine. This interlocutory appeal is limited to the excessive-force claim based on hog-tying.

No. 19-60350

In other words, defendants may appeal, but they "must be prepared to concede the best view of the facts to the plaintiff." *Lytle v. Bexar County*, 560 F.3d 404, 409 (5th Cir. 2009) (quoting *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007)). If the defendant would still be entitled to qualified immunity "even assuming the accuracy of the plaintiff's version of the facts," then the district court's denial of summary judgment was improper. *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc). Within this limited scope of jurisdiction, our review is de novo. *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (en banc).

III.

Qualified immunity shields officers from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When officers invoke qualified immunity at summary judgment, courts ask two questions: (1) whether the evidence viewed in the light most favorable to the plaintiff shows that the officers violated a constitutional right, and (2) whether the unlawfulness of their conduct was "clearly established" at the time. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

The resolution of this appeal turns principally on the clarity of the law. But before we turn to that prong, we briefly address whether the facts show that the Officers violated a constitutional right.

A.

Kelli claims that the Officers used excessive force in hog-tying Troy. To prevail on an excessive-force claim, the plaintiff must show (1) an injury, (2) that resulted "directly and only" from a use of excessive force, and (3) that the force used was "objectively unreasonable." *Flores*, 381 F.3d at 396. There's no dispute that Troy's death is a sufficient injury, so our focus is on the second and third elements: causation and excessiveness.

No. 19-60350

1.

The Officers contend that Kelli can't satisfy the second element because it isn't clear that Troy's death did—or even could—result "directly and only" from their use of hog-tying. The Officers misconstrue the nature of this element. As we've explained, this element requires proof of causation. *Dunn v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996) (en banc). It was intended to distinguish between injuries caused by excessive force, which are actionable, and those caused by reasonable force, which are not. *Id.*

Notwithstanding the language of this element, Kelli need not prove that the Officers' excessive force was the sole cause of Troy's death. *See id.*; *Mouille v. City of Live Oak*, 918 F.2d 548, 553 (5th Cir. 1990). Nor is she required to prove that Troy's death was foreseeable. *See Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018) (holding that the "eggshell skull rule" applies in excessive-force cases). For example, a plaintiff can satisfy the causation element by showing that an arrestee would not have died if the officers had not used excessive force, even if the arrestee had "preexisting medical conditions" that "contributed to his death." *Id.*

In short, Kelli need only show that the Officers' use of excessive force in hog-tying Troy was a "contributory cause" of Troy's death. *See Gutierrez*, 139 F.3d at 450 n.8. Kelli produced evidence that Troy died as a result of being hog-tied. Therefore, Kelli can satisfy the causation element.

2.

The next question is whether the Officers' actions were "objectively reasonable" under the circumstances confronting them. *Graham v. Connor*, 490 U.S. 386, 397 (1989). In making this determination, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Goodman v. Harris County*, 571 F.3d 388, 397 (5th Cir. 2009) (quoting *Graham*, 490 U.S.

at 396). This requires "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. We typically focus on three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

When balanced against the relatively weak interest the Officers had in arresting Troy, their use of hog-tying was objectively unreasonable. First, there's a dispute as to whether Troy committed a crime. The Officers claim that Troy was guilty of disorderly conduct and resisting arrest—both nonviolent misdemeanors. *See* MISS. CODE. ANN. §§ 97-9-73, 97-35-7. These types of crimes "militat[e] against the use of force." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017). Thus, the severity of the crime, if any, was minimal.

Second, there's a dispute as to whether Troy posed an immediate threat of serious harm to anyone when the Officers hog-tied him. At no point was Troy thought to be armed, and he was already handcuffed and subdued. Under these facts, a jury could find that the Officers had no reason to think Troy posed an immediate threat to anyone's safety. Troy's relatively small size, particularly in comparison to that of the five Officers,[5] reinforces this point. *See Samples v. Vadzemnieks*, 900 F.3d 655, 662 (5th Cir. 2018).

Third, there's a dispute as to whether Troy was actively resisting arrest when the Officers hog-tied him. Keep in mind, "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Lytle*, 560 F.3d at 413. So even if Troy's conduct earlier in the encounter amounted to active resistance, "the

---

[5] Troy was six feet tall but weighed only one hundred fifty pounds and had the stature of a "bean pole." All of the Officers were substantially bigger than him. In fact, at six feet, four inches tall and two hundred eighty-five pounds, Price alone was nearly twice Troy's size.

No. 19-60350

force calculus changes substantially once that resistance ends." *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015). The Officers claim that Troy was kicking and trying to roll over, but Kelli denies this. We must accept Kelli's version of the facts and draw all reasonable inferences in her favor. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). Given the testimony that Troy was pinned down by multiple officers and appeared to be struggling to breathe, a jury could find that he was "merely trying to get into a position where he could breathe and was not resisting arrest." *Darden*, 880 F.3d at 730.

All in all, a jury could find that the Officers lacked reason to believe that Troy committed a crime, posed a threat to anyone, or actively resisted arrest when they hog-tied him. On those facts, a jury could reasonably conclude that the Officers used excessive force in violation of the Fourth Amendment.

B.

The Officers argue that even if they used excessive force, they're entitled to qualified immunity because the unlawfulness of their conduct was not clearly established at the time. To be "clearly established," the law must be sufficiently clear that reasonable officers would understand that what they're doing is unlawful. *Wesby*, 138 S. Ct. at 589–90. In excessive-force cases, we must define the clearly established law with a "high 'degree of specificity.'" *Id.* at 590 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)). As a result, officers are usually entitled to immunity "unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix*, 136 S. Ct. at 309).

But that doesn't mean "the very action in question [must have] previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, a "case directly on point" isn't required. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The law can be clearly established "despite notable factual distinctions" between the precedent relied on and the case then

No. 19-60350

before the court, as long as the prior decision put the officers on notice that their conduct was unlawful. *Kinney*, 367 F.3d at 350 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). The essential element, then, is "fair warning." *Id.*

So the question is whether the state of the law in 2015 gave the Officers fair warning that hog-tying Troy would constitute excessive force under the circumstances. To answer that question, we look first to "controlling authority," i.e., published opinions of the Supreme Court and the Fifth Circuit. *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018). If we find controlling authority on point, our inquiry ends. *McClendon v. City of Columbia*, 305 F.3d 314, 327 n.10 (5th Cir. 2002) (en banc). Absent controlling authority, we look to our sister circuits to see whether "a robust 'consensus of cases of persuasive authority'" established the unlawfulness of the conduct at issue. *Shumpert*, 905 F.3d at 320 (quoting *al-Kidd*, 563 U.S. at 742).

1.

At the time in question, the Fifth Circuit had decided three cases addressing whether officers used excessive force when they hog-tied arrestees. In the first case, *Gutierrez v. City of San Antonio*, officers observed Rene Gutierrez "running around in circles in the middle of the street." 139 F.3d at 442–43. As they approached him, "he began swinging his arms wildly and crawling toward them." *Id.* at 443. The officers thought Gutierrez might be "on some type of drugs." *Id.* Once they learned that he had "shot some bad coke," they called for an ambulance. *Id.* Though Gutierrez was initially calm, he became combative when the ambulance arrived, and the paramedics refused to transport him. *Id.* So the officers decided to drive him to the hospital themselves. *Id.* They placed him face down in the back seat of their car with his hands cuffed behind his back. *Id.* Because Gutierrez continued to kick, they hog-tied him. *Id.* At first, Gutierrez was conscious and struggling. But he went silent ten minutes into the drive. *Id.* When they arrived, Gutierrez was dead.

10

In *Gutierrez*, we held that the officers were not entitled to qualified immunity at the summary-judgment stage. *Id.* at 445–52. Relying on a widely circulated medical study, we first found that hog-tying becomes deadly force in certain circumstances—"when a drug-affected person in a state of excited delirium[6] is hog-tied and placed face down in a prone position." *Id.* at 446–47, 451. As a result, we determined that, absent a threat of serious physical harm, "hog-tying in [those] circumstances would have violated law clearly established prior to November 1994." *Id.* at 446–47. We then considered whether those circumstances were present. There was evidence that the officers had reason to believe that Gutierrez was on drugs. *Id.* at 448–49. And although Gutierrez was combative at times, there was evidence that he didn't pose a threat of serious harm to anyone when the officers hog-tied him. *Id.* Thus, under Gutierrez's version of the facts, the officers violated clearly established law.

Years later, we decided *Hill v. Carroll County*, 587 F.3d 230 (5th Cir. 2009). In response to a call about a fight, one officer arrived to find Debbie Loggins holding another woman in a headlock. *Id.* at 232. When he approached Loggins, she tackled him to the ground and beat him in the head with his flashlight. *Id.* A second officer arrived, and the two officers eventually managed to handcuff Loggins and restrain her legs. *Id.* But they couldn't get her into a patrol car because she continued to fight. *Id.* So they hog-tied her. *Id.* They

---

[6] "Excited delirium" is generally described as a state of agitation, excitability, and paranoia. *See, e.g.*, *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1299 n.4 (11th Cir. 2009). Symptoms include bizarre behavior, confusion, delusions, hyperactivity, incoherent yelling, and sweating. *See id.*; *Hoyt v. Cooks*, 672 F.3d 972, 979 (11th Cir. 2012). It's often associated with drug use, most commonly cocaine, and is sometimes referred to as "cocaine-psychosis" for that reason. *See, e.g.*, *Gutierrez*, 139 F.3d at 444. But other drugs, including LSD, have also been associated with excited delirium.

were then able to put her in the back seat, where she rode face down during a half-hour trip to jail. *Id.* at 233. At some point during the drive, Loggins died.

In *Hill*, we held that the officers' use of force wasn't excessive because "none of the additional contributing or associated factors that cast doubt on the propriety of [hog-tying]" were present. *Id.* at 237. Most notably, there was no evidence of "drug abuse or drug-induced psychosis." *Id.* at 235. It was also undisputed that Loggins violently resisted arrest. *See id.* at 237. Indeed, the officers resorted to hog-tying Loggins only after many failed attempts to subdue her. *Id.* For those reasons, the officers' decision to hog-tie Loggins wasn't "excessively disproportionate to the resistance they faced." *Id.*

Next, we decided *Khan v. Normand*, 683 F.3d 192 (5th Cir. 2012) (per curiam). Officers responded to a call about a man, later identified as Nayeem Khan, screaming and running around inside of a Winn-Dixie. *Id.* at 193. When they attempted to remove Khan from the store, he "forcefully resisted." *Id.* Khan thrashed his legs, attempted to bite, and even reached for an officer's gun. *Id.* He continued to fight even after he was handcuffed, so the officers hog-tied him. *Id.* Once hog-tied, Khan stopped breathing "[a]lmost immediately." *Id.* The officers quickly removed the restraints, but Khan died later that night.

In *Khan*, we held that the officers were entitled to qualified immunity because the unlawfulness of their conduct wasn't clearly established. *Id.* at 196. We acknowledged that hog-tying in the circumstances identified in *Gutierrez* would constitute excessive force. *Id.* at 194. But *Gutierrez* was distinguishable. Critically, there was no evidence that the officers knew Khan was on drugs, and Khan was hog-tied for only a moment. *Id.* at 195–96.

A fourth case, *Pratt v. Harris County*, 822 F.3d 174 (5th Cir. 2016), hadn't been decided when the Officers hog-tied Troy, so we discuss it only to show how *Gutierrez* guided the analysis. Wayne Pratt wrecked his car and put up a fight when officers arrived. *Id.* at 178. The officers managed to handcuff

him, but he broke free. *Id.* Once they regained control, they hog-tied him. *Id.* at 178–79. He stopped breathing soon after and died the next day. *Id.* at 179.

In *Pratt*, we affirmed summary judgment in favor of the officers. Notably, "the officers who hog-tied Pratt were unaware of his use of drugs or alcohol when they hog-tied him," unlike the officers in *Gutierrez. Id.* at 184. And Pratt was hog-tied for only "a very brief period," unlike the arrestee in *Gutierrez. Id.* It was also undisputed that Pratt aggressively evaded the officers, violently resisted arrest, and posed a threat if left unrestrained. *Id.*

As shown by our precedent, *Gutierrez* presents us with "several yardsticks" by which to measure claims for excessive force involving restraints. *Wagner v. Bay City*, 227 F.3d 316, 323 (5th Cir. 2000). Unless justified by a threat of serious harm, hog-tying a drug-affected person in a state of drug-induced psychosis and placing him face down in a prone position for an extended period constitutes excessive force. *Compare Gutierrez*, 139 F.3d at 446–51, *with Khan*, 683 F.3d at 195–96, *and Hill*, 587 F.3d at 235–37. Thus, if the facts here are sufficiently similar to those in *Gutierrez*, then the Officers would not be entitled to qualified immunity.

The Officers argue that *Gutierrez* didn't clearly establish the unlawfulness of hog-tying under any circumstances because the medical study it relied on has been called into question by a study co-authored by Dr. Tom Neuman and three others, including one of the defense experts here, *see* Theodore C. Chan et al., *Restraint Position and Positional Asphyxia*, 30 ANNALS EMERGENCY MED. 578 (1997)). In *Gutierrez*, we relied on a study by the San Diego Police Department and the research of Dr. Donald T. Reay as evidence that hog-tying can become deadly force. 139 F.3d at 446, 448. We were aware of Dr. Neuman's study, however, and acknowledged that it possibly "call[ed] the validity of Dr. Reay's research into question," but we didn't consider it because it wasn't in the record. *Id.* at 451. We similarly noted Dr.

Neuman's study in *Hill* and *Khan*, but it didn't affect our analysis in those cases; we still applied the *Gutierrez* factors. *Khan*, 683 F.3d at 195 & n.4; *Hill*, 587 F.3d at 235 n.3.

Dr. Neuman's study has no bearing on whether the law was clearly established. First, the various studies are relevant to whether hog-tying in certain circumstances is "deadly force." But "whether a particular use of force is 'deadly force' is a question of fact." *Flores*, 381 F.3d at 399. We must accept the truth of Kelli's evidence on the degree of force used.[7] Second, Dr. Neuman's study can't unsettle the law in this circuit. Although a circuit split can sometimes show that the law wasn't clearly established, *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc), the same isn't true of a "battle of the experts" like we have here, *see Gutierrez*, 139 F.3d at 447. Even when other circuits are split,[8] our inquiry ends if "the law was clearly established in this circuit." *McClendon*, 305 F.3d at 327 n.10 (quoting *Boddie v. City of Columbus*, 989 F.2d 745, 748 (5th Cir. 1993)). *Gutierrez* remains binding precedent.

We conclude that *Gutierrez* clearly established the unlawfulness of hog-tying in certain circumstances. The next step is to determine whether the facts

---

[7] Kelli argues that Dr. Neuman's study is inapplicable because Dr. Neuman restricted it to healthy individuals. In fact, the study acknowledged that "a combination of factors, including underlying medical condition, intoxication, agitation, delirium, and struggle as well as body position, may result in respiratory compromise not detected by [this] study." Chan et al., *supra*, at 585. For this reason, some courts have rejected Dr. Neuman's study when the person hog-tied appeared to have a diminished capacity, such as being on drugs. *See, e.g.*, *Cruz*, 239 F.3d at 1188–89. We must assume that this dispute will be resolved in Kelli's favor.

[8] Although we need not look to the state of the law in other jurisdictions, our decision in *Gutierrez* comports with the decisions of our sister circuits that have considered the reasonableness of using similar restraints on nonthreatening, minimally resistant individuals showing signs of drug use or mental disability. *See, e.g.*, *Martin v. City of Broadview Heights*, 712 F.3d 951, 958–63 (6th Cir. 2013); *Weigel v. Broad*, 544 F.3d 1143, 1151–55 (10th Cir. 2008); *Sallenger v. Oakes*, 473 F.3d 731, 739–42, 742 n.3 (7th Cir. 2007); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056–62 (9th Cir. 2003).

here are similar enough to those in *Gutierrez* for that case to have given the Officers fair warning that hog-tying Troy would constitute excessive force.

2.

The facts here mirror those in *Gutierrez* in all relevant respects. First, the Officers knew that Troy was "under the influence of drugs." *Gutierrez*, 139 F.3d at 449. Second, Troy exhibited signs of excited delirium. *See id.* at 451. In fact, he was running around in circles, sweating profusely, yelling incoherently, and "acting really strange," similar to how Gutierrez was acting. *See id.* at 443. Third, despite Troy's drug use and bizarre behavior, the Officers hog-tied Troy. *See id.* Fourth, the Officers placed Troy "in a face-down prone position" while hog-tied. *Id.* at 444. And unlike the officers in *Khan*, who removed the restraints almost immediately, the Officers here left Troy hog-tied for ninety minutes—three times as long as the thirty-minute period in *Hill*, which we described as an "extended period of time." *Khan*, 683 F.3d at 195; *see also Hill*, 587 F.3d at 233. Finally, there's a dispute as to whether Troy posed a threat to anyone when the Officers hog-tied him, just as there was in *Gutierrez*. 139 F.3d at 449. Thus, *Gutierrez* squarely governs this case.

The Officers' attempts to distinguish *Gutierrez* are unpersuasive. First, the Officers point out that Troy was under the influence of LSD, not cocaine. This minor distinction is immaterial. Our holding in *Gutierrez* addressed the lawfulness of hog-tying a person who is "drug-affected." *Id.* at 451. Although we used the term "cocaine psychosis," we made it clear that we were referring to excited delirium, *id.* at 444, which can be caused by many different drugs, including LSD. Indeed, we have since used the term "drug-induced psychosis" instead. *Khan* 683 F.3d at 196; *Hill*, 587 F.3d at 235.

Second, the Officers argue that the "constant monitoring" of Troy separates this case from *Gutierrez*. Even if monitoring is relevant to whether

the Officers' use of force was excessive,[9] the district court found that "the degree to which Troy was actively monitored" was genuinely disputed. We lack jurisdiction to review the genuineness of that dispute. *Kinney*, 367 F.3d at 347. And in deciding the clearly established prong, we can't "define [this] case's 'context' in a manner that imports genuinely disputed fact[s]." *Tolan*, 572 U.S. at 657. Because this argument relies on disputed facts, we do not consider it.

In sum, hog-tying a nonviolent, drug-affected person in a state of drug-induced psychosis and placing him in a prone position for an extended period is objectively unreasonable. In light of the similarities between the facts of *Gutierrez* and those here, the state of the law in 2015 was sufficiently clear to provide fair warning to the Officers that their alleged conduct was unlawful.

## IV.

The Officers also argue that the district court improperly judged them as a group. When defendants assert qualified immunity, courts must "assess the reasonableness of each defendant's actions separately." *Pratt*, 822 F.3d at 181 (citing *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007)). But "[s]eparate consideration does not require courts to conduct a separate analysis for each officer [if] their actions are materially indistinguishable." *Meadours*, 483 F.3d at 422 n.3. "[I]t merely requires them to *consider* each officer's actions." *Id.*

The district court properly considered each Officer's actions. After thoroughly discussing the facts, the court found that Baggett, Bond, Price, Rich, and Scallorn each "participated in [hog-tying] Troy with knowledge of his drug intoxication." Thus, a separate analysis for each Officer wasn't necessary.

---

[9] In *Hill*, we clarified that a claim for failure to monitor is a claim for "failure to provide medical attention due to insufficient monitoring," which "sounds not in the Fourth Amendment but in the Fourteenth." 587 F.3d at 237–38. So even though the plaintiff included the officers' failure to monitor within her excessive-force claim, we treated it as a separate claim and didn't mention the officers' failure to monitor in our excessive-force analysis. *Id.*

No. 19-60350

V.

On the facts as we must take them, the Officers' conduct in hog-tying Troy violated clearly established law. Of course, at trial, Kelli will bear the burden of proving the many facts and inferences that we assume in her favor. Depending on the facts proven at trial and the inferences drawn by the jury, a very different picture may result than the one we confront here. The Officers may ultimately be protected by qualified immunity in the end. But they aren't entitled to qualified immunity at this stage.

For these reasons, we AFFIRM the district court's denial of summary judgment on the claim for excessive force by hog-tying.