IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 10, 2008

Charles R. Fulbruge III
Clerk

No. 06-60463

DELTA & PINE LAND COMPANY

Plaintiff-Appellant

v.

NATIONWIDE AGRIBUSINESS INSURANCE COMPANY; NATIONWIDE
MUTUAL INSURANCE COMPANY

Defendants-Appellees

Appeal from the United States District Court
For the Southern District of Mississippi

Before REAVLEY, GARZA, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Delta & Pine Land Company ("DPL") appeals the district court's grant of summary judgment in favor of defendants Nationwide Agribusiness Insurance Company and Nationwide Mutual Insurance Company (collectively, "Nationwide"). DPL argues that the district court erred in concluding that the insurance policies purchased by DPL from Nationwide do not cover the claims made in a lawsuit filed against DPL and that, accordingly, Nationwide has no duty to defend or indemnify DPL. We agree with DPL and therefore vacate the summary judgment. Applying Mississippi law, we conclude that Nationwide has a duty to defend DPL under the insurance policies but pretermit whether it also

has a duty to indemnify. The district court's judgment is VACATED, and the case is REMANDED to it for proceedings in accordance with this opinion.

## I. Background

DPL develops, markets, and sells cotton seed to farmers to be used for the purpose of raising and selling cotton. In 2002, fifty-six individual farmers ("Farmers") filed suit ("underlying suit") against DPL, alleging that they had suffered substantial losses in crop yields because DPL sold them a mixture of old NuCotn 33B cotton seed negligently blended with new seed. DPL owned a Commercial General Liability Policy ("CGL Policy") and a Commercial Umbrella Liability Policy ("Umbrella Policy"), both of which were written and issued by Nationwide.

When served with the Farmers' complaint in the underlying suit, DPL filed the instant declaratory judgment action against Nationwide for indemnification and defense of DPL in the underlying suit.[1] After DPL and Nationwide filed opposing motions for summary judgment, the district court granted summary judgment in favor of Nationwide on the ground that the claims asserted by Farmers in the underlying action are not covered under either the CGL Policy or the Umbrella Policy and, therefore, Nationwide has no duty or defend or indemnify DPL. DPL timely appealed.

## II. Legal Standards

We review de novo the district court's ruling on a motion for summary judgment, applying the same legal standard as the district court in the first instance. Wyatt v. Hunt Plywood Co., Inc., 297 F.3d 405, 408 (5th Cir. 2002). Summary judgment is appropriate if "the pleadings, the discovery and disclosure

---

[1] Nationwide assumed the defense of DPL under reservation of rights.

materials on file, and any affidavits show that there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c); see also Wyatt, 297 F.3d at 408-09. When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U.S. 574, 587 (1986). Instead, we "draw all reasonable inferences in favor of the nonmoving party." Id.; Wyatt, 297 F.3d at 409. However, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or "only a scintilla of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In a diversity case such as this, we apply Mississippi substantive law. See Krieser v. Hobbs, 166 F.3d 736, 739 (5th Cir. 1999). Our task is not to formulate new rules to govern insurance cases arising under the laws of Mississippi; it is merely to ascertain what the Supreme Court of Mississippi has already declared the state law to be and apply it to this case. See Batts v. Tow-Motor Forklift Co., 978 F.2d 1386, 1389 (5th Cir. 1992).

With regard to coverage and duty to defend, under Mississippi law, the ultimate outcome or merit of the claim is irrelevant with regard to the question of a duty to defend. Great No. Nekoosa Corp. v. Aetna Cas. & Sur. Co., 921 F. Supp. 401, 406-07 (N.D. Miss. 1996). As long as the claim is "arguably" covered by the insurance policy, the duty to defend is triggered. Ingalls Shipbuilding v. Fed. Ins. Co., 410 F.3d 214, 225 (5th Cir. 2005) ("We review the allegations in

3

[the] complaint to see whether it states a claim that is within or arguably within the scope of the coverage provided by [the insurance] policy.") (applying Mississippi law).

Under Mississippi law, once we identify an ambiguity in the contract and determine that DPL's interpretation of the insurance contract is reasonable, we must strictly construe the contract language in favor of the insured, DPL. See Provident Life & Acc. Ins. Co. v. Goel, 274 F.3d 984, 991 (5th Cir. 2001) ("Mississippi courts strictly construe any ambiguity in an insurance policy against the insurer.") (emphasis added); see also U.S. Fid. & Guar. Co. v. Omnibank, 812 So. 2d 196, 198-99 (Miss. 2002). Any fair doubt should be resolved in favor of the insured. Bellefonte Ins. Co. v. Griffin, 358 So. 2d 387, 390 (Miss. 1978) ("It is well established that ambiguity and doubt in an insurance policy must be resolved in favor of the insured."); Caldwell v. Hartford Acc. & Indem. Co., 160 So. 2d 209, 212-13 (Miss. 1964).

In the following sections, we will first determine whether the policy arguably covers the Farmers' claims, then decide if any exclusions apply.

III. Policy Coverage

Three basic requirements must be met to trigger Nationwide's duty to defend under the CGL and the Umbrella Policy: (1) a plaintiff must allege that it sustained "damages because of 'bodily injury' or 'property damage'" to trigger defense coverage under the CGL; and a plaintiff must allege that it sustained a loss because of "bodily injury, property damage, personal injury, or advertising injury" to trigger defense coverage under the Umbrella Policy;[2] (2) the alleged

---

[2] The CGL provides that "[Nationwide] will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' . . . [and] will

4

damage must be alleged to have been caused by an "occurrence"; and (3) there must be no valid exclusion that applies. It is undisputed that the alleged damages were caused by an "occurrence"; so the only issues on appeal are whether requirements (1) and (3) were met so as to trigger the duty to defend coverages.[3]

A. Coverage under the CGL

The CGL Policy provides that Nationwide "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage.'" However, an Endorsement modifies this definition. The "Seed Merchants Endorsement" explicitly states that it "changes" the CGL Policy and "modifies" the coverage extended by the CGL Policy.[4] The Endorsement then states that "[d]amages because of 'property damage' include loss resulting from . . . an error in mechanical mixture of seed."

---

have the right and duty to defend the insured against any 'suit' seeking those damages."

[3] The "occurrence" issue was not addressed by the district court because "after another amended complaint was filed in the underlying state court action, the occurrence issue no longer required resolution." Nationwide does not specifically raise the occurrence issue in this appeal. Instead its argument before the district court that the Farmers do not complain of an "occurrence" is the same argument on appeal for no coverage under the "expected or intended injury exclusion," which we address in the next section.

[4] The Endorsement is prefaced in large bold letters with "THIS ENDORSEMENT CHANGES THE POLICY." Consequently, it is clear that the Endorsement's modifications of the CGL's coverage section "change" the definition of "property damage" so as to cover Part A's enumerated risks. As the preface notes, the Endorsement's modifications "change[] the policy"; the effect of the Endorsement's modifications is therefore not expressly circumscribed and limited, as the dissent argues, to only the Coverage section of the CGL policy. The insurer could have, as it did with the Seedmen's Limitation, drafted the Endorsement to say instead that "all other conditions and provisions of the policy remain unchanged" and expressly limit the effect of the modifications to the Coverage section. However, the insurer did not include such express language in the Endorsement. At the very least, the insured's reading is reasonable, and therefore we must rule in favor of the insured. See, e.g., Bellefonte Ins. Co., 358 So. 2d at 390.

Generally, the purpose of a rider to an insurance policy, such as an attached endorsement, is to make "additions to a policy [which] are actually for the purpose of modifying the general terms of the policy, and therefore, being specific, control the more general terms of the policy." Camden Fire Ins. Ass'n v. New Buena Vista Hotel Co., 24 So. 2d 848, 851 (Miss. 1946); Turbo Trucking Co., Inc. v. Those Underwriters at Lloyd's London, 776 F.2d 527, 529-30 (5th Cir. 1985). An endorsement thereby "controls the policy insofar as it enlarges, modifies or restricts the terms" of the policy. New Buena Vista Hotel Co., 24 So.2d at 850. An endorsement also can act as "a predominating influence in determining the meaning and intent of the policy." Id. Moreover, if there is any conflict between the rider and the policy, "the rider controls in construing the contract expressly where the provisions of the rider are the more specific." Id. at 851.

DPL argues for a reasonable reading of the Seed Merchants Endorsement in accord with its plain language and the general purpose of endorsements. DPL reads the Endorsement as redefining and enlarging the term "damages because of property damage" under the CGL to cover any "loss resulting from an error in mechanical mixture of seed." DPL's reading is reasonable because the only purpose of the Endorsement is to enlarge the coverage of the policy by enlarging covered property damage to include losses resulting from an error in mechanical mixture of seed. Nationwide's (and the dissent's) proposed reading that "the endorsement still mandates that a claim must be for 'property damage' as [originally] defined by the [unamended] CGL" does not logically follow and would

make part A of the Endorsement a meaningless and ineffectual provision.[5] As DPL presents a reasonable reading of the Endorsement, we must adopt that reading because it resolves ambiguity or doubt in favor of the insured in accordance with Mississippi law. E.g., Caldwell, 160 So. 2d at 212-13. Therefore, since the Farmers allege a loss caused by a negligent, and therefore erroneous, mixing of seed, we read the Endorsement as providing coverage thereby triggering Nationwide's duty to defend DPL against the Farmers' suit.

B. Coverage under the Umbrella Policy[6]

The Umbrella Policy similarly defines property damage as "physical injury to or destruction of tangible property . . . including all resulting loss of use of that property" or "loss of use of tangible property which has not been physically injured or destroyed." The Umbrella Policy is also similarly modified by an Endorsement, the "Seedmen's Limitation," which specifically changes the policy to include a $10 million coverage for "losses arising out of. . . error in mechanical

---

[5] The dissent reads the modification described in paragraph A of the Endorsement as serving no purpose except to "clarify" the coverage of existing insurance and to list already covered risks as a reference for paragraph B. Thus, the dissent's reading deprives Part A of any operative effect, contrary to Mississippi law, which requires that a contractual provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. See, e.g., Brown v. Hartford Ins. Co., 606 So.2d 122, 125-26 (Miss. 1992).

[6] The dissent attempts to use its method of reading the Endorsement to construe the Seedmen's Limitation against providing coverage, but the dissent's methodology is even farther afield here. Unlike the Endorsement, the Seedmen's Limitation contains no language whatsoever that can be taken out of context to cabin its changes to the policy to any particular policy section. Therefore, it is reasonable for one to read the Seedmen's Limitation, even under the dissent's argument, as a modification of the entire policy, including the coverage and "property damage" definition. In fact, a plain reading of the Limitation suggests the policy is extending a $10 million insurance limit to all claims filed pursuant to the policy for losses resulting from errors in the mechanical mixtures of seeds. There are no express limitations. Since this is a reasonable interpretation, we must side with the insured. See, e.g., Bellefonte Ins. Co., 358 So. 2d at 390.

mixture of seed." The Limitation intended to "change" the policy, because the drafter of the Seedmen's Limitation included a disclaimer that "all other conditions and provisions of the [Umbrella Policy] remain unchanged." (emphasis added).

For the same reasons we noted earlier, we find this Seedmen's Limitation modifies and enlarges the terms of coverage in the Umbrella Policy by extending a $10 million coverage for loss arising out of error in mechanical mixture of seed. Notwithstanding the more limited definition of "property damage" in the Umbrella Policy, the Seedmen's Limitation specifically modifies the insurance provided by adding specific coverage for errors in mechanical mixture of seed in addition to the coverage established by the Umbrella Policy.[7]

---

[7] In addition to both Endorsements' plain language, two cases that deal with similar "seed mixing" policy provisions also support DPL's reading and our finding that DPL's interpretation of these Endorsements as reasonable.

In Ranger Ins. Co. v. Glove Seed & Feed Co., Inc., 865 P.2d 451, 458 (Or. Ct. App. 1993), an Oregon court concluded that the term "property damage" must be considered, as a matter of law, in context of the covered liability. "Property damage" in a policy designed to cover losses caused by improper seed mixing is different from "property damage" defined in a more general policy. "There is no basis for [the] assertion that the term 'property damage' in [one policy] must, as a matter of law, be equivalent to the term 'damage to . . . property' in [the other policy]." Id. As with the insured in Ranger Ins. Co., DPL's "purpose for purchasing [a general policy and coverage for loss resulting from seed mixing errors] was to cover two different kinds of liability, not to duplicate coverage." Since both Endorsements "change" the original policies, DPL and Nationwide negotiated a different kind of liability coverage in the Endorsements and did not just duplicate coverage already created. Therefore, the Endorsements' modification and enlargement of the CGL and Umbrella Policy's "property damage" definition can be reasonably construed as an effort to create a new kind of liability coverage for losses related to the errors in the mechanical mixture of seed beyond the limits of the pre-existing "damages because of 'property damage'" definition.

In Shields v. Gardner, the Idaho Supreme Court noted that a loss of crop yield was exactly the type of transaction covered by an endorsement insuring against "errors in mechanical mixtures" and that such an endorsement was added so as to "specifically provid[e] protection for certain named additional perils incidental to the insured's seed business." 444 P.2d 38, 42 (Idaho 1968). Moreover, the court noted that it is obvious that an endorsement such as the one found in this case covers crop loss from erroneous mixing of seeds. "Where the

DPL provides a reasonable reading of both Endorsements and we find coverage under the Endorsements for "loss resulting from . . . an error in mechanical mixture of seed." As the Farmers are requesting "compensatory damages" for DPL's "negligently blending old seed with new seed," they are, at the very least, arguably asserting an error in the mechanical mixture of seed, and therefore both the CGL and Umbrella Policy cover DPL's defense against the Farmers' complaint. See Ingalls Shipbuilding, 410 F.3d at 225-26 ("We review the allegations in [the] complaint to see whether it states a claim that is within or arguably within the scope of the coverage provided by [the insurance] policy. . . When in doubt, defend.") (emphasis added) (internal quotations and citations omitted).

## IV. Exclusions

Nationwide also asserts that three exclusions apply. We disagree. Nationwide bears the burden of showing that an exclusion applies and that it is not subject to any other reasonable interpretation that would afford coverage. Centennial Ins. Co. v. Ryder Truck Rental, 149 F.3d 378, 383 (5th Cir. 1998).

A. Expected or Intended Injury Exclusion

The "property damage expected or intended" exclusion does not apply so as to bar coverage, because this clause only excludes coverage for "property damage . . . expected or intended from the standpoint of the insured." However, the Farmers primarily assert damages resulting from the negligent and grossly negligent mixing of seed and not damages resulting from an intentional injury. In the Farmers' complaint, they clearly allege that "DPL was negligent and their

___

insurer issues this kind of endorsement, he is presumed to know that nature of his insured's business and that it is one wherein liability may be imposed from erroneous mixtures in seed preparation." Id.

9

actions fell below acceptable standards of care in one or more of the following respects:

> a. negligently blending old seed with new seed, thereby decreasing seed vigor and reducing yield produced."[8]

This exclusion therefore does not apply.[9]

B. "Your Product" Exclusion

Second, Nationwide contends the "Your Product" exclusion applies. The "Your Product" exclusion only applies to property damage to the insured's own product. Essentially, Nationwide argues that a decreased crop yield is damage to DPL's own product, the cotton seed, and therefore should be excluded. We disagree with Nationwide's construction of the exclusion. We read the exclusion as plainly not applying to the situation at hand. The Farmers do not complain of damage to DPL's seed, but damage to the Farmers' crop land's use, i.e., their crop yield. Damage to the use of one's crop land is distinguished from damage

---

[8] Nationwide's argument that Omnibank, 812 So. 2d at 201 supports a finding of no coverage here is without merit. In Omnibank, the Mississippi Supreme Court held that "a claim resulting from intentional conduct which causes foreseeable harm is not covered, even where the actual injury or damages are greater than expected or intended." (emphasis added). The Farmers allege that the conduct, i.e., seed mixing, itself was negligent.

[9] Whether or not DPL actually admits it intended to blend old and new seed as Nationwide alleges is irrelevant to this appeal. We look at the allegations in the complaint to determine if a duty to defend is triggered under the so-called "eight-corners" test. Ingalls Shipbuilding, 410 F.3d at 225 & n.17; see also Farmland Mut. Ins. Co. v. Scruggs, 886 So. 2d 714, 719 (Miss. 2004) ("A liability insurance company has an absolute duty to defend a complaint which contains allegations covered by the language of the policy, but it has absolutely no duty to defend those claims which fall outside the coverage of the policy."); see generally Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 552 (5th Cir. 2004) (describing the "eight-corners" test for a Texas insurance case and stating that under the test, "the duty to defend analysis is not influenced by facts ascertained before the suit, developed in the process of litigation, or by the ultimate outcome of the suit.").

to DPL's product — the seed itself. See *St. Paul Fire & Marine Ins. Co. v. No. Grain Co.*, 365 F.2d 361, 368 (8th Cir. 1966) ("By virtue of the germination process involved in the production of wheat a transformation did, in fact, occur so as to constitute the wheat crop a separate and distinct entity from the original seed wheat."). While the seed is DPL's product, the resulting crop and its use of the crop land are the Farmers' separate property. Accordingly, we construe the exclusion in favor of DPL; it does not apply.

C. The Seedmen's Modified Liability Coverage Endorsement

The Seedmen's Modified Liability Coverage Endorsement has two clauses. "We read the policy as a whole, considering all the relevant portions together and, whenever possible, should give operable effect to every provision in order to reach a reasonable overall result." *Progressive Gulf Ins. Co. v. We Care Day Care Center, Inc.*, 953 So. 2d 250, 253 (Miss. Ct. App. 2006) (internal quotations omitted). Reading this Endorsement as a whole, one reasonable reading is that clause one of the Endorsement provides that "all covered seed losses arising out of the failure of seed to germinate, the most [Nationwide] will pay is $100,000 per occurrence," and clause two, which begins with "[t]his insurance," refers back to the modified insurance provided by clause one. Therefore the Endorsement's applicability hinges on whether the claim is a covered seed loss arising out of the failure of seed to germinate. However, Nationwide concedes in its brief that the "farmers purchased this seed, planted it, and it germinated and emerged." Appellees' Brief, at 26 (emphasis added). The Farmers' alleged harm is not the seed's failure to germinate, but the reduced yield in the germinated cotton crop; therefore, the Seedmen's Modified Liability Coverage Endorsement, which solely limits recovery to $100,000 for losses resulting from the seed's failure to germinate, does not apply in this case.

11

## V. Conclusion

We conclude that the Endorsements to the CGL and the Umbrella Policy afford coverage to the extent of imposing a duty to defend against the Farmers' claims as described in the forgoing opinion and that none of the exclusions in the policies or endorsements apply. Accordingly, Nationwide has a duty to defend DPL under both the CGL and Umbrella Policy against the Farmers' claims. As the proceedings are still ongoing and early in the Farmers' suit in state court, we will not reach the issue of the duty to indemnify. See Lamar Homes, Inc. v. Mid Continent Cas. Co., 501 F.3d 435, 436 (5th Cir. 2007). Accordingly, we VACATE the district court's judgment and REMAND for proceedings consistent with this opinion.

EMILIO M. GARZA, Circuit Judge, DISSENTING:

The majority opinion almost gets it right. I agree with the majority's conclusion that the Seed Merchants Endorsement to the CGL Policy and the Seedmen's Limitation to the Umbrella Policy expands the coverage of these policies. I disagree, however, that these endorsements expand or modify the policies' definition of "property damage."

Because the Farmers' complaint in the underlying litigation fails to allege "property damage," within the meaning of these policies, I would find that Nationwide has no duty to defend or indemnify DPL and AFFIRM the judgment of the district court.[1]

The Seed Merchants Endorsement to the CGL Policy does not modify the definition of "property damage." The plain language of the Endorsement specifies with the utmost precision the only portion of the policy which it modifies:

A. The following is added to paragraph 1. of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):

1. Insuring Agreement.

d. Damages because of "property damage" include loss resulting from:

(1) The erroneous delivery of seed, which includes:

(a) The failure to deliver seed;

(b) The delivery of wrong seed; or

---

[1] Although not pertinent to my discussion of "property damage," I also disagree with the majority's analysis of whether the Seedmen's Modified Liability Coverage Endorsement excludes coverage in this case. However, because DPL failed at the threshold to establish that the Farmers' complaint alleges damages because of "property damage," it is unnecessary to analyze whether any exclusions apply, and I will not address the issue further.

13

> > (c) The delivery of seed at the wrong time of season; or

> (2) An error in mechanical mixture of seed.

(emphasis added). The language is clear; the Seed Merchants Endorsement only modifies the "Coverages" section of the policy.

"Property damage" is defined in the "Definitions" section of the policy, not the "Coverages" section. "Property damage" is a defined term in the CGL Policy. The term appears in quotation marks throughout both the policy and the Seed Merchants Endorsement. According to an introductory clause of the policy, "words and phrases that appear in quotation marks have special meaning." (emphasis added). For those meanings, the policy directs readers: "Refer to DEFINITIONS (SECTION V)." The "Definitions" section is a discrete part of the policy, separate and apart from the section on "Coverages."

Because "property damage" is a defined term under the CGL Policy and because the Seed Merchants Endorsement expressly modifies only "Coverages" and not "Definitions," the definition of "property damage" must be read as part of the endorsement, not as modified by it. The definition of "property damage" from the "Definitions" section thus governs both the CGL Policy and the Seed Merchants Endorsement. That definition requires either "physical injury to tangible property, including all resulting loss of use of that property" or "loss of use of tangible property that is not physically injured."[2]

---

[2] The majority rejects this reading of the Endorsement, reasoning that the reading "does not logically follow" and "would make part A of the Endorsement a meaningless and ineffectual provision." I disagree.

The Endorsement serves at least two purposes. First, the Endorsement clarifies that the generic language of the CGL Policy extends to risks related to the core business activities of the insured as a seed merchant. Second, the Endorsement extends coverage to risks that might otherwise be excluded by Exclusion 'm' of the policy.

Exclusion 'm' in the CGL Policy excludes coverage for certain risks arising from the

Likewise, the Seedmen's Limitation to the Umbrella Policy does not modify that policy's definition of "property damage."[3] In full, the Seedmen's Limitation provides: "The most we will pay under this policy is $10,000,000 for losses arising out of the mislabeling, misdelivery, or error in mechanical mixture of seed. All other conditions and provisions of the policy remain unchanged." The Seedmen's Limitation, like the Seed Merchants Endorsement, contains no language that alters the definition of "property damage" under the Umbrella Policy.[4]

---

defective design of the insured's product or the insured's failure to perform on a contract. See APPLEMAN ON INSURANCE, § 132.9 (2d ed. 2007) (describing this exclusion as the "Design Error" exclusion or the "Failure to Perform" exclusion, the purpose of which "always has been to exclude the 'loss of use' of property that results in claims because of actions in the named insured's control"). The enumerated risks in paragraph A of the Endorsement—the "erroneous delivery of seed" or "error in mechanical mixture of seed"—are the sorts of risks that might be excluded under Exclusion 'm.' However, paragraph B of the Endorsement provides that Exclusion 'm' does not apply to any "property damage" described by the enumerated risks added to the insuring agreement in paragraph A.

   Paragraph A is not meaningless and ineffectual. Paragraph A describes a narrow set of risks that paragraph B then expressly removes from the scope of Exclusion 'm.' Thus, the Endorsement, through the interaction of both paragraphs A and B, effectively creates an exclusion to the exclusion and, in doing so, expands the coverage of the policy.

   [3] The definition of "property damage" in the Umbrella Policy is similar to that of the CGL Policy. The Umbrella Policy defines "property damage" as "physical injury to or destruction of tangible property . . . including all resulting loss of use of that property" or "loss of use of tangible property which has not been physically injured or destroyed."

   [4] Because the Seedmen's Limitation contains no express limitations describing what part of the policy it modifies, the majority urges that it is reasonable to read the Limitation "as a modification of the entire policy, including the coverage and 'property damage' definition." Under Mississippi Law, "unless the clause of an insurance agreement is ambiguous it should be enforced as written." United States Fid. & Guar. Co. v. Omnibank, 812 So.2d 196, 200 (Miss. 2002) (en banc). The language of the Limitation speaks for itself. The Limitation does not even mention "property damage." There is no language in that provision that renders "property damage"—a defined term with special meaning under the Umbrella Policy—ambiguous. Reasonable readings and possible readings are not the same thing.

15

The majority's reading of these endorsements eviscerates the need to allege a physical injury to tangible property where, as here, the complaint alleges an error in the mechanical mixture of seed. The majority's reading redefines "property damage" to mean any loss resulting from "an error in mechanical mixture of seed." This is a dramatic alteration to the definition of "property damage" as that term is defined in these policies. Because there is no indication from the plain language of either the Seed Merchants Endorsement or the Seedmen's Limitation that such a sweeping result was intended, I reject the majority's conclusion that such a reading of these endorsements is reasonable.[5]

The only question remaining is whether the Farmers' complaint in the underlying litigation alleges damages because of "property damage," as defined in either the CGL Policy or the Umbrella Policy. Under either policy, the Farmers must have alleged "physical injury" to "tangible property" or the "loss of use of tangible property." (emphasis added).

The Third Amended Complaint in the underlying action by the Farmers alleges that DPL "was negligent and their actions fell below acceptable standards of care" by "negligently blending old seed with new seed, thereby decreasing seed vigor and reducing the yield [of the cotton crop] produced."

Further, the complaint alleges: "Plaintiffs suffered a loss of yield and economic damages. Specifically, Plaintiffs suffered lost proceeds from decreased

---

[5] The majority's reliance on Ranger Ins. Co. v. Glove Seed & Feed Co., Inc., 865 P.2d 451 (Or. Ct. App. 1993) is misplaced. The majority relies on this non-binding Oregon authority to support an argument that the definition of "property damage" may differ as a matter of law depending on the nature and purpose of a particular liability policy. While this is no doubt true, a finding that a defined term in the policy is modified by some other provision of the policy, such as an endorsement, must be supported by the plain language of the policy. The plain language of the endorsements in these policies does not support the majority's conclusion that the term "property damage" was modified or redefined.

production of NuCotn 33B [(a DPL cotton seed variety)]." (emphasis added). The Farmers claim that the inferior seed caused the Farmers "to obtain cotton yields substantially less than they would have obtained had the seed been of proper quality." (emphasis added). The Farmers were allegedly "subjected to severe mental anguish and pain in having to watch their crops grow and eventually realize that their cotton crops were not going to yield amounts which they would have normally expected." (emphasis added). The Farmers claim that DPL denied them "their rightful economic benefits expected from the cotton crop." (emphasis added). The Farmers complain that they "were not able to make sufficient yields as were represented and were therefore unable to receive the expected monetary return from the cotton grown." (emphasis added). The Farmers claim that DPL interfered with their "prospective economic opportunities."

As for damages, the Farmers "demand compensatory damages for the negligent, or alternatively, intentional economic loss they sustained as a result of the seed in question and additionally demand compensatory damages for mental pain and anguish in an amount to be determined by the trier of fact." (emphasis added).

The Farmers complain about reduced crop yield. The seed they purchased from DPL did indeed germinate and produce crops, albeit a smaller yield than that apparently anticipated by the Farmers. The complaint seeks damages for economic losses sustained by the Farmers, compensatory damages for mental pain and anguish, and punitive damages for DPL's "willful, wanton, and malicious" or "grossly negligent" acts. However, all of these allegations stem from the allegedly reduced yield. The complaint contains no allegation that the

17

Farmers' cotton crops or other tangible property were physically injured or that there was a loss of use of the cotton, the seed, or any other tangible property.

Under Mississippi law, "economic losses are not 'property damage.'" Audubon Ins. Co. v. Stefancik, 98 F. Supp. 2d 751, 756 (S.D. Miss. 1999) (citing Snug Harbor Ltd. v. Zurich Ins., 968 F.2d 538, 542 n.13 (5th Cir. 1992)). The losses claimed by the Farmers are essentially for a loss or diminution of value to their cotton crops for the season in question. This diminution in value stems from alleged reduced yield of the seed, not from any actual physical injury to the crops or other tangible property. The injuries alleged in the Farmers' underlying complaint thus do not constitute "property damage" within the meaning of the CGL Policy or the Umbrella Policy.[6]

Because the Farmers' complaint fails to allege "property damage" within the meaning of the CGL Policy or the Umbrella Policy, the district court correctly concluded that Nationwide's duty to defend or indemnify DPL was never triggered. The majority's opinion concludes otherwise, and therefore I respectfully dissent.

---

[6] In discussing whether any exclusion applies, the majority states that the Farmers complain of "damage to the Farmers' crop land's use, i.e., their crop yield." Nowhere in the complaint do the Farmers' complain about damage to their land use. If they did, this might be a different case. Rather, the Farmer's complaint is framed in terms of the economic losses they sustained as a result of the less-than-anticipated yield allegedly occasioned by the defective seeds.