# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 6, 2025

Lyle W. Cayce
Clerk

No. 19-30715

Jim C. Cambre,

*Plaintiff—Appellee*,

*versus*

Roger Gottardi; Jason Wilson,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-6509

_____

Before Higginbotham, Richman, and Willett, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:[*]

Iraq War veteran Jim C. Cambre (Cambre) sued two St. Tammany Parish Sheriff's Office (STPSO) deputies, Roger Gottardi and Jason Wilson (Defendants), pursuant to 42 U.S.C. § 1983. Cambre alleged that he was tased and beaten by the Defendants during an encounter in front of his residence in Pearl River, Louisiana. The Defendants asserted qualified immunity, but the district court declined to grant summary judgment in their

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

## No. 19-30715

favor. This interlocutory appeal followed. We reverse the district court's denial of qualified immunity.

### I

"Once a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defense is not available."[1] In reviewing the denial of qualified immunity at the summary judgment stage, though our review is de novo,[2] we "must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."[3] Accordingly, we consider Cambre's testimony and other evidence, as distinguished from the allegations in his complaint, as well as undisputed facts, and the facts to which Cambre gives credence. We note that the district court's ruling stated repeatedly that it accepted Cambre's allegations as true, which was incorrect at the summary judgment stage. Allegations are not evidence. Equally importantly, we focus on the evidence regarding Gottardi and Wilson because their actions, and not those of others involved on the night Cambre was taken into custody, are the subject of this appeal.

Cambre served in the military and at one point was a military policeman. Since returning from Iraq, Cambre has suffered from depression and post-traumatic stress disorder. On January 21, 2018, Cambre posted on Facebook: "F**k, I'm struggling over here!!" After seeing this post, several of Cambre's friends tried to contact him, but Cambre did not answer their phone calls. Concerned, Cambre's friends contacted the Pearl River Police Department, which dispatched Officer Jessica Picasso to Cambre's home.

---

[1] *Kovacic v. Villareal*, 628 F.3d 209, 211 (5th Cir. 2010).

[2] *Id.*

[3] *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (per curiam).

Paramedics Pam Little and Joshua Landry from the Pearl River Fire Department were dispatched to the scene as well.

Picasso, Little, and Landry arrived at Cambre's home at approximately the same time around 11 p.m.  Little knocked on the door, and Cambre came out.  Cambre had volunteered at the fire department and had worked with Little on multiple occasions.  Little had also assisted Cambre during a separate incident at the Pearl River Police Department approximately three weeks earlier on New Year's Eve.  On the night of this previous incident, Cambre appeared outside the police station, had been drinking heavily, and was "experiencing suicidal ideation."  During the New Year's Eve incident, Cambre said to Little, "I can just act like I have a gun and [the police] will shoot me and it will all be over."  But Little negotiated with Cambre, and she was eventually able to convince him to go to the hospital, where he remained for eleven days.

The incident giving rise to this suit occurred on January 21, about ten days after Cambre's discharge from the hospital.  Little attempted to persuade Cambre to go to the hospital again for evaluation, but Cambre "was adamant he didn't want to go."  He was afraid that if he were readmitted to the hospital, he would lose his job at the Veterans Administration.  Unable to persuade Cambre herself, Little eventually requested Deputy Fire Chief Matt Parish to come to the scene to help.  Parish also knew Cambre from the latter's work as a volunteer at the fire department.

On his way to the scene, Parish called the Pearl River Police Department for backup.  He told Pearl River Police Department dispatch that "Cambre had military training and had previously mentioned suicide by cop."  Pearl River Police Department dispatch informed Parish that she would have to contact STPSO for backup since Pearl River Police Department only had one unit working that night.  Parish said he would

discuss the matter with the officer on the scene (Picasso) before making the final call.

After Parish arrived on the scene, Little called Medical Control to discuss Cambre's situation and her concerns. Under Louisiana law, a person may be taken into protective custody and transported to a treatment facility for involuntary medical evaluation.[4] Medical Control eventually gave the order to transport Cambre to the hospital for evaluation. Having received the order to transport, Little and Parish approached Cambre to let him know what Medical Control had advised. Even after being told of the order from Medical Control, Cambre still would not allow Parish and Little to transport him to the hospital.

While Little continued to negotiate with Cambre, Parish approached Officer Picasso and discussed the need for additional backup. Parish told Picasso that he had already contacted Pearl River Police Department dispatch, but he wanted to let Picasso make the final call. Ultimately, the request for backup went out. Pearl River Police Department dispatch contacted STPSO dispatch requesting "back-up" for a possible "27-29S" by a "military officer" who had previously threatened "suicide by cop." The "27-29S" indicated attempted murder by suicide.[5]

After receiving this information from the Pearl River Police Department, STPSO sent out the following dispatch to its patrolling officers:

---

[4] *See* La. Stat. Ann. § 28:53(L)(1).

[5] The number "27" references Louisiana's attempt statute. La. Stat. Ann. § 14:27. The number "29" references Louisiana's criminal homicide statute. *Id.* § 14:29. The letter "S" indicates suicide.

No. 19-30715

> PRPD NEEDING ASSISTANCE IN REF TO A 27/29 FOR A CHRIS CAMBRE . . . HAS HISTORY OF 27/29 ALSO STATED HE IS SUICIDE BY COP . . . IS IN MILITARY . . . ONLY HAVE ONE UNIT WHO IS OUT THERE . . . UNKN [UNKNOWN] MEANS.

Five STPSO officers responded to the dispatch, including Gottardi and Wilson.

The STPSO officers arrived on the scene carrying their rifles. They immediately approached Cambre and Little and asked if Cambre had any weapons. Little said that Cambre was unarmed. They asked Little how she knew that Cambre did not have weapons; Little said she knew because she had hugged him. Upon hearing this exchange, Cambre lifted his shirt and turned 360 degrees. The officers then walked back to Officer Picasso's patrol vehicle and stowed their rifles. Two apprehending officers testified that it was possible Cambre could have possessed a weapon of some sort in his pocket(s), including a firearm, knife, or other type of weapon.

After stowing their rifles, one of the deputies asked Picasso "what was going on?" Picasso told the deputy that "it's just a welfare check, they said he needs to go to the hospital, he doesn't want to go and he's trained military." Around this time, Parish had Little move away from Cambre and go with him to get the stretcher out of the medic unit.

Multiple witnesses who were on the scene at the time of the incident in question provided evidence of the tasing and the aftermath. Deputy Chad Melendez said in an interview with internal investigators about two weeks after the incident that when officers approached Cambre just prior to the tasing event, Cambre kept putting his right hand in his pocket and was "very uneasy." Melendez said that it was "about that time" that "one of the fire guys said the last time they were there they had to fight him [Cambre]," that "he [Cambre] had this time made threats to kill himself if they left," and

5

"that he [Cambre] had a lot of weapons inside the trailer." Melendez said they then "kept getting closer and closer to him," and "at the time, you know, we're saying hey, you're not in trouble or anything like that. What's going on?" Rather than paraphrase Melendez's further statement, we quote it:

> We started getting closer and closer. And once again we tried to reassure him he was not in trouble with us. But he keeps dipping his hand back in his pocket. You know, it was like he was trying to initiate a confrontation, a lethal confrontation to get us to hurt him or something, shoot him. And we just kept moving closer and closer. And about that time the decision was made just to move in and swarm him. As we moved in, Deputy Gottardi utilized his taser device.

Melendez stated that Deputy Gottardi, one of the two officers who are appellants before us, gave commands to Cambre before the taser was deployed, and stated further that "[w]e all gave him commands, get on the ground. I was yelling at the top of my lungs, 'Get on the ground, get on the ground.'" When asked if commands were given more than once, Melendez said, "Several times. And he just balled his fist up and he was ready to fight. He took like a boxer stance where he was bringing his hands up to his sides and anticipating a fist encounter." Melendez said Cambre did not get on the ground, and that was when Deputy Gottardi deployed the taser.

Melendez reiterated many of these facts in his deposition, testifying that he told Cambre "[s]everal times" that Cambre was "not in trouble with us." Melendez testified that "[s]hortly after" Cambre lifted his shirt, Cambre slowly put his hand into one of his front pockets multiple times as if "to force us to take some type of action against him." Melendez affirmed that he saw "Cambre ball his fists" and get "in some sort of a fighting stance." Melendez testified that he gave Cambre "[s]everal very loud commands to get on the ground." Finally, after both Melendez and Gottardi

continued to give verbal commands to get on the ground, "at that point, shortly thereafter, the taser was deployed."

Deputy Fire Chief Parish filed an incident report stating that STPSO deputies asked Cambre to comply with requests to get on the ground, he did not, they tased him, and they then handcuffed him. Parish also told internal affairs investigators four days after the incident that "I know I heard them hollering, 'Sheriff's department. Get on the ground.' He didn't get on the ground. So I know they tased him." Parish subsequently testified in his deposition that two deputies were approaching Cambre from behind him and two were "coming from the front." Parish also testified that he heard a deputy tell Cambre to get down on the ground before he was tased.

Another fire department officer, Landry, told investigators three days after the event that deputies told Cambre "to calm down" and that after that, "they took their guns off" and put them in a vehicle. The STPSO officers then "came back," by which time two more sheriff's deputies were approaching, and Landry heard "Get on the ground, get on the ground." Landry and Little had started to walk away to get the stretcher, and when Landry heard "get on the ground" the second time, he turned around to look. Landry said, "When they said it the third time, he wouldn't get down, they tased him. And four of them were on top of him. And they put him in cuffs and stuff." Landry clarified in the same statement that Cambre hit the ground after he was tased, and then "[f]our of them got on top of him." Landry then heard officers say, "Put your hands behind your back. Put your hands behind your back, I ain't got time for this f***in' sh*t."

Evidence from Little was consistent. She told investigators four days after the incident, and testified in her subsequent deposition, that she heard deputies command Cambre to get on the ground before she heard a taser fired. A police officer on the scene, Picasso, heard a sheriff's deputy tell

Cambre to "get on his knees" before the taser was fired, and she later heard "stop resisting." A device report showed that the officers deployed the taser for approximately fifteen seconds.

Officer Wilson, an appellant in the case before us, testified that after Cambre was on the ground, and at least two officers were attempting to restrain him, Cambre "was still physically resisting them," and Wilson saw Cambre's "upper body tensing and moving." Wilson said he could not see Cambre's right arm, and it "appeared that he was intentionally keeping his arm tucked up under his body, so that we could not get control of it." Wilson was concerned that there might be a weapon underneath Cambre or that he had access to a weapon on his person, and Wilson therefore drew his baton. Wilson was concerned for the safety of the other officers and himself, testifying that he did not want "to be placed in a dangerous situation where my life is at stake." He further testified:

> I wasn't particularly interested in killing Mr. Cambre. . . . [M]y chief objective at that point was to get him to relinquish control of his right hand or his right arm as quickly as possible; and under the circumstances, the most reasonable course of action to me at that point was to utilize another pain compliance tool.

Wilson "then began administering a series of reverse strikes to Mr. Cambre's left thigh region while also giving him [at least one] loud verbal command[] to give up his hand." Wilson testified that he did not hit Cambre anywhere other than on his left thigh.

Cambre points to an incident report by the Pearl River Police Department, which Officer Picasso authored the day after the incident that is the subject of this appeal. Picasso's report reflects that at the beginning of the incident, Cambre told her and Little that he wanted to "go back inside and finish it," and that "if he was dead he wouldn't have to worry about paying his bills." Picasso's report further says that after STPSO officers

8

had arrived on the scene and secured their weapons in Picasso's vehicle after Cambre lifted his shirt, two STPSO officers approached Cambre from his left side and, without speaking to him "or getting a sense of his demeanor," one officer said, "I'm tired of dealing with your f***ing sh*t; get down on your knees!"   Picasso's report then states that a second deputy then "immediately deployed his controlled electronic device," and "[t]hree other deputies' [sic] simultaneously approached Mr. Cambre from behind on his right side where all five deputies then jumped on Mr. Cambre while one deputy continuously struck Mr. Cambre with a baton."   This statement differs in some respects from other evidence in the record, but not materially for purposes of summary judgment.  Picasso's report does not address what fire department officials may have told sheriff's deputies about Cambre's past aggressive behavior when previously arrested or explain why Picasso would have heard such statements by fire officials had they been made. Picasso's statement does not conflict with testimony that Cambre had not been patted down for weapons by anyone and that he clinched his fists as officers approached, nor does it purport to know what he was doing with his right hand.  Her written report confirms that Cambre was given a warning before he was tased.  It does not address where Cambre's right arm was when he fell to the ground or whether she could have observed if he was resisting arrest when officers were on top of him.  Picasso's report, written the day after the incident, said that she "observed Mr. Cambre having blood running from near his ear down his neck and swelling to his face."  This is consistent with an "abrasion" on Cambre's cheek near his ear, which medical records show that hospital personnel observed during a physical exam after he was tased.

Picasso was deposed after the date of her written report.  When asked if Cambre's resistance was passive, she said, "With the deputies out there, he was passive aggressive at first.  I don't know when they all started moving

towards him. I didn't see him to be able to answer that question accurately the whole time." She said she was not able to see Cambre because "[m]y focus was on the deputies." She testified that at the time she wrote her report, she did not "have the benefit of knowing exactly how Pearl River dispatch had contacted the sheriff's office and informed them of the need for assistance." By the time of her deposition, she said, "I was told that they were sent to a suicide by cop hostage type situation, is what they were told." Based on the voice recordings of the dispatcher that are in the record, it is undisputed that this is what was conveyed to STPSO. When asked during Picasso's deposition if she saw any STPSO deputy use a baton and strike Cambre in the head, she testified, "I saw him strike but I didn't see where he struck at." She testified that she did not believe STPSO deputies used excessive force in taking Cambre into custody, and she reiterated that she heard the sheriff's office command Cambre to "get on his knees" before the taser was deployed.

Cambre testified that he did not see anyone with a baton in his or her hand and did not feel anyone strike him in the head or elsewhere with a baton. He recalls that he was on his stomach on the ground, and that "the electricity [was] still going through my body with someone screaming at me to stop resisting," but he does not know if anyone was on top of him at that point. He testified that "with the electrical current going through me, that's the only thing that I felt." But he believed he was hit by a baton based on "bruises on [his] leg, ribs, and head." When asked, "[W]hen is the first time you recall actually having the sensation of someone's hands being placed on you," he responded, "Once the tase had ended, I felt the officer grab my left wrist, place a cuff on it, and then place a cuff on my right wrist."

Cambre was taken to the Ochsner Medical Center for examination. Cambre's medical records from the hospital noted a taser puncture wound on his right flank as well as an "abrasion to his left cheek just anterior to his

ear." The examination also noted a blood alcohol content of 227 mg/dL—roughly two and a half times the legal limit for operating a vehicle. Cambre was discharged from the hospital the morning after he was taken into custody.

Cambre subsequently sued Gottardi and Wilson alleging, among other things, excessive use of force in violation of the Fourth Amendment.[6] According to Cambre's complaint, the Defendants' "uses of force, including . . . the use of a [taser] and the use of a baton (particularly, baton strikes to the head, which are deadly uses of force), were not justified under the circumstances and were excessive." Discovery proceeded, and numerous witnesses, including Cambre, were deposed. The Defendants moved for summary judgment, asserting qualified immunity. The district court denied the Defendants' motion. This interlocutory appeal followed.

## II

In denying the Defendants' motion for summary judgment on qualified immunity grounds, the district court held that the Defendants "violat[ed] Cambre's Fourth Amendment right to be free from excessive force" and that the Defendants' conduct was "objectively unreasonable in light of then-existing clearly established law." On appeal, the Defendants argue that the "district court erred in failing to identify any clearly established law particularized to the facts of this case that precluded a grant of qualified immunity." We do not resolve whether either Gottardi or Wilson violated Cambre's constitutional rights, though it is highly questionable that either did so based on the summary judgment record, as opposed to the allegations in Cambre's complaint. We conclude that,

---

[6] In addition to Gottardi and Wilson, Cambre also sued STPO Sheriff Randy Smith, Corporal Ryan Hopkins, Deputy Chad Melendez, and Deputy Christopher Harman. Smith filed a motion to dismiss, which was subsequently granted by the district court. Cambre voluntarily dismissed Hopkins, Melendez, and Harman with prejudice.

viewing the facts in the light most favorable to Cambre, the law was not clearly established on the night in question that the Fourth Amendment prohibited the Defendants' conduct in the particular situation they confronted.[7]   Accordingly, we reverse the district court's decision denying qualified immunity and render summary judgment in the Defendants' favor.

## III

We review a district court's ruling on summary judgment de novo, applying the same legal standards as the district court.[8]   Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9]   Generally, "the movant bears the initial burden of demonstrating the absence of a material fact issue."[10]   However, "'[a] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof,' shifting it to the plaintiff to show that the defense is not available."[11]   To negate the qualified immunity defense, the plaintiff must make a two-step showing.[12]   "First, a plaintiff must show that the official violated a statutory or constitutional right; second, [the plaintiff] must show

---

[7] *See Mullenix v. Luna*, 577 U.S. 7, 12-13 (2015) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199-200 (2004) (per curiam)).

[8] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008) (citing *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 408 (5th Cir. 2002)); *see also* Fed. R. Civ. P. 56.

[9] *Uptown Grill, L.L.C. v. Camellia Grill Holdings, Inc.*, 920 F.3d 243, 247 (5th Cir. 2019) (quoting *Bridges v. Empire Scaffold, L.L.C.*, 875 F.3d 222, 225 (5th Cir. 2017)).

[10] *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

[11] *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (per curiam) (quoting *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015)).

[12] *Voss v. Goode*, 954 F.3d 234, 238 (5th Cir. 2020).

that the right was clearly established at the time of the challenged conduct."[13] We have discretion in deciding which step of the qualified immunity defense to address first.[14]

Without deciding whether the Defendants' conduct constituted a constitutional violation, we conclude that the law was not clearly established at the time of the Defendants' conduct. Clearly established law for qualified immunity purposes means that the law is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[15] "[C]learly established law must be 'particularized' to the facts of the case"[16] and not defined at a "high level of generality."[17] "In other words, outside of 'an obvious case,' the law is only 'clearly established' if a prior case exists 'where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'"[18] "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular [action] 'beyond debate.'"[19]

---

[13] *Id.* (citing *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc)).

[14] *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[15] *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

[16] *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (quoting *Mullenix*, 577 U.S. at 13).

[17] *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

[18] *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (alteration in original) (quoting *White*, 580 U.S. at 79); *see also Mullenix*, 577 U.S. at 12 ("Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))).

[19] *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (quoting *al-Kidd*, 563 U.S. at 741).

No. 19-30715

## A

Without much discussion, the district court concluded that "clearly established law demonstrates that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance." In reaching this conclusion, the district court failed to identify any cases "where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment."[20] Instead, the district court relied on a patchwork of generalized statements of law from factually dissimilar cases to conclude that the constitutional question in this case is beyond debate.[21]

The majority of the cases the district court cited in its order denying summary judgment—and that Cambre now cites on appeal—involved minor traffic violations.[22] For instance, in *Hanks v. Rogers*,[23] an officer half-

---

[20] *Id.* (alteration in original) (quoting *White*, 580 U.S. at 79).

[21] *See Melton v. Phillips*, 875 F.3d 256, 265 (5th Cir. 2017) (en banc); *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015) ("Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather, the inquiry must focus on whether a right is clearly established as to the specific facts of the case." (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam))); *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) ("[C]ourts will not deny immunity unless 'existing precedent . . . placed the statutory or constitutional question beyond debate." (second alteration in original) (quoting *al-Kidd*, 563 U.S. at 741)).

[22] *See Hanks*, 853 F.3d at 741-43; *Brothers v. Zoss*, 837 F.3d 513, 515-16, 519-20 (5th Cir. 2016); *Pratt v. Harris County*, 822 F.3d 174, 177-78 (5th Cir. 2016); *Doss v. Helpenstell*, 626 F. App'x 453, 454-55 (5th Cir. 2015) (per curiam); *Newman v. Guedry*, 703 F.3d 757, 759, 763 (5th Cir. 2012); *Deville v. Marcantel*, 567 F.3d 156, 161-63 (5th Cir. 2009) (per curiam); *cf. Trammell v. Fruge*, 868 F.3d 332, 336, 339-43 (5th Cir. 2017) (analyzing an officer's use of force against allegedly intoxicated suspect who had wrecked his motorcycle coming home from a bar).

[23] 853 F.3d 738 (5th Cir. 2017).

14

speared[24] a motorist he had pulled over for driving under the interstate speed limit.[25] We held in that case that it was clearly established that an officer "violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, *and whom the officer stopped for a minor traffic violation*."[26] Likewise, in *Newman v. Guedry*,[27] officers tased and beat a passenger who had been in a vehicle that was pulled over for failing to yield to oncoming traffic.[28] The officers had allegedly begun to beat and tase the passenger after he told an off-color joke during a pat-down.[29] We held that the officers "use of force was objectively unreasonable in th[o]se circumstances," given that the vehicle had been pulled over for a "mere traffic violation" and that the "officers used force in response to nothing more than an off-color joke."[30]

This case cannot be compared to a minor traffic stop. In this case, the undisputed dispatch record shows that the officers were dispatched as backup to assist with an individual who had "a history of [attempted suicide]" and had "stated he is suicide by cop." The dispatch also informed the officers that Cambre was in the military and that his means were unknown. Cambre was also highly intoxicated when the officers arrived. A medical order had been issued to transport Cambre to a hospital for

---

[24] *See id.* at 743 (defining a "half spear" as a blow to the upper back or neck).

[25] *Id.* at 741.

[26] *Id.* at 747 (emphasis added) (citing *Deville*, 567 F.3d at 167-69).

[27] 703 F.3d 757 (5th Cir. 2012).

[28] *Id.* at 759-60.

[29] *Id.* at 762.

[30] *Id.*

evaluation before the officers being sued arrived on the scene.  This situation hardly resembles a minor traffic stop.

Nor can this case be compared to any of the non-traffic-violation cases cited by the district court, such as *Darden v. City of Fort Worth*.[31]  In *Darden*, a large team of heavily armed police officers executed a no-knock search warrant on a private residence.[32]  The officers suspected cocaine was being sold from the residence.[33]  When the officers entered the residence, the suspect was kneeling on the couch.[34]  Eyewitnesses testified that the suspect "put his hands in the air when the officers entered the residence, complied with the officers' commands, and did not resist arrest."[35]  Yet the officers threw the man to the ground, then proceeded to choke, tase, and repeatedly kick and punch the man in the face.[36]  During the beating, the man had a heart attack and died.[37]  We held that it was clearly established that an "officer uses excessive force when the officer strikes, punches, or violently slams a suspect who is not resisting arrest."[38]  In other words, we held that it was clearly established that "gratuitously harming a restrained suspect constitutes excessive force."[39]

_____

[31] 880 F.3d 722 (5th Cir. 2018).

[32] *Id.* at 725.

[33] *Id.*

[34] *Id.*

[35] *Id.* at 731.

[36] *Id.* at 726.

[37] *Id.* at 725.

[38] *Id.* at 732.

[39] *Id.* (quoting *Griggs v. Brewer*, 841 F.3d 308, 315-16 (5th Cir. 2016)).

Here, the officers entered a situation where the suspect had previously threatened to commit suicide by cop.  The suspect was "trained military" with "unknown means."  The officers were told that the suspect "need[ed] to go to the hospital," and that "he [did not] want to go."  The suspect was also highly intoxicated.  *Darden* involved none of those factors.  The witness testimony in this case also paints a much different picture than the witness testimony in *Darden*.  Unlike *Darden*, the witness testimony in this case does not establish that the officers "gratuitously harm[ed]" a suspect who had surrendered himself and was complying with all the officers' commands.[40] Four different witnesses testified that the officers did not employ force until after issuing the command for Cambre to "get on the ground."  Unlike in *Darden*, Cambre was refusing to comply with officer commands when the officers chose to deploy a taser.

Admittedly, failure to comply with officer commands does not always warrant the use of force, and we have distinguished between "active" and "passive" resistance.[41]  "But the line between active and passive resistance is sometimes hazy and must be judged in light of the 'necessarily fact-intensive' nature of the inquiry."[42]  When someone has "not committed a crime, attempted flight, or disobeyed any commands," the use of a taser is almost certainly "excessive."[43]

---

[40] *See Darden v. City of Fort Worth*, 880 F.3d 722, 732 (5th Cir. 2018) (quoting *Griggs v. Brewer*, 841 F.3d 308, 315-16 (5th Cir. 2016)).

[41] *See, e.g.*, *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam).

[42] *Betts v. Brennan*, 22 F.4th 577, 583 (5th Cir. 2022) (quoting *Deville*, 567 F.3d at 167).

[43] *Cloud v. Stone*, 993 F.3d 379, 385 (5th Cir. 2021) (citing *Newman v. Guedry*, 703 F.3d 757, 762-63 (5th Cir. 2012)).

Here, however, Cambre ignored officer commands, and (according to some witnesses) either balled his fists or continued to slide his hands into his pockets. In a different context, Cambre's actions seem passive, and the district court cited caselaw to that effect.[44] But Cambre has not identified a case that accounts for the unique circumstances present here: the officers were called and told that the man now failing to comply with their instructions had expressed a desire to commit suicide by cop. Cases involving traffic stops are unavailing in this context, as "clearly established law must be 'particularized' to the facts of the case."[45] A traffic stop, unlike an attempt to restrain or transport a suicidal individual, does not carry with it the same inherent danger or risk to human life. For these reasons, we cannot say that clearly established law shows the officers violated the Fourth Amendment by resorting to physical, non-lethal force when a suicidal individual failed to comply with repeated officer commands.

**B**

"It is true that the same incident can include both lawful and unlawful uses of force."[46] Accordingly, we examine whether the baton strikes to Cambre *post*-taser deployment violated clearly established law. We conclude that they did not.

It is clear in this circuit that "the use of certain force after an arrestee has been restrained and handcuffed is excessive and unreasonable."[47] In other qualified immunity cases, we have held that it is "clearly established—

---

[44] *E.g.*, *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017).

[45] *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[46] *Cloud*, 993 F.3d at 386.

[47] *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013).

and possibly even obvious—that an officer violates the Fourth Amendment if he shoots an unarmed, incapacitated suspect who is moving away from everyone present at the scene."[48]  However, we have held that an officer's continued use of force after a taser is deployed is not *clearly* unreasonable.[49]

It may instinctively seem unfair to hit Cambre with a baton for failing to permit officers access to his right arm if he had been completely immobilized by the taser.  However, it may not be clear to an apprehending officer whether a person has been completely immobilized by tasing and if so, for how long.  Officers attempting to subdue Cambre saw movement in his upper body and were unable to place a handcuff on his right arm while it remained underneath him.  There is no clearly established law as to whether or how an officer may be able to ascertain why a tased individual has failed to allow access to his arm for handcuffing—whether he is unable to move his arm due to the tasing or is instead resisting.  Accordingly, we cannot say that the law is "clearly established" with respect to the officers' actions.

In *Poole v. City of Shreveport*,[50] for example, two officers tried to grab Roger Poole during a tense traffic stop where Poole refused to "turn around and give up his right arm."[51]  After the initial physical interaction, Poole alleged that the officers "tasered him repeatedly" because he "tucked [his arm] into his chest and verbally and physically resisted [the officers'] repeated stern commands . . . to give it to [them]."[52]  After tasing Poole, the

---

[48] *Roque v. Harvel*, 993 F.3d 325, 339 (5th Cir. 2021).

[49] *See Cloud*, 933 F.3d at 386-87 (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

[50] 691 F.3d 624 (5th Cir. 2012).

[51] *Id.* at 629.

[52] *Id.* at 626, 629.

officers "flipped Poole onto the ground, and yanked his arms" in order to apply the handcuffs.[53]   On appeal, we found the officers were entitled to qualified immunity despite the fact that they had already tasered Poole before flipping him onto the ground and "yank[ing] his arms."[54]

Importantly, our caselaw notes that "the use of certain force after an arrestee has been *restrained and handcuffed* is excessive and unreasonable"[55]; however, Cambre had not been fully restrained when he was struck by the baton.  While "a reasonable officer wouldn't need a specific case 'to know that he cannot shoot a compliant suspect and that he cannot fire again at someone who is objectively "downed or incapacitated,"'"[56] caselaw concerning force post-tasing is less clear.  Cambre has not identified a case that speaks to the continued use of force after a taser is deployed but before the individual is handcuffed; there is no clearly established law showing that Cambre, in this context, would be considered "downed or incapacitated" when officers were unable to place him in handcuffs.  Additionally, none of the witnesses on the scene the night of the incident testified to seeing Cambre being struck in the head with a baton.  Indeed, one witness affirmatively testified that Cambre was not struck on the head.  Moreover, both Picasso and Cambre himself testified to having heard officers command Cambre to "stop resisting" during the struggle on the ground.

_____

[53] *Id.* at 626.

[54] *Id.*

[55] *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) (emphasis added).

[56] *Roque v. Harvel*, 993 F.3d 325, 338 (5th Cir. 2021) (quoting *Graves v. Zachary*, 277 F. App'x 344, 349 (5th Cir. 2008)).

No. 19-30715

## C

Our conclusions here are strictly limited to the facts and related caselaw before us. We are not holding that the use of physical force after the deployment of a taser is presumptively reasonable. Nor are we saying that an individual must be handcuffed before an officer's use of force becomes unreasonable. All we are saying is that "existing precedent [did not] place[] the conclusion that [Gottardi and Wilson] acted unreasonably in these circumstances 'beyond debate.'"[57] Not only did the officers encounter a noncompliant individual with suicidal ideation and military training, but they warned him repeatedly before deploying the taser, and employed baton strikes only when they could not access his other arm for purposes of handcuffing him. We conclude that, under the particular circumstances of this case, existing precedent did not place the lawfulness of the Defendants' actions beyond debate. For these reasons, the Defendants are entitled to qualified immunity. The district court erred in holding otherwise.

\* \* \*

We REVERSE the district court's denial of qualified immunity and RENDER summary judgment in Gottardi and Wilson's favor.

---

[57] *Mullenix v. Luna*, 577 U.S. 7, 14 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).